IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| RICHARD ALLEN DEVILLIER, ET AL. | § | |
| *Plaintiffs* | § | |
| | § | |
| V. | § | Civil Action No. _____ |
| | § | |
| THE STATE OF TEXAS | § | |
| *Defendant* | § | |

### DEFENDANT'S NOTICE OF REMOVAL TO FEDERAL COURT

NOW COMES Defendant the State of Texas (hereinafter "Defendant") and hereby files this notice of removal under 28 U.S.C. § 1446(a). As support, Defendant respectfully shows this Court the following:

1.      Plaintiffs are Richard and Wendy Devillier; Steven and Rhonda Devillier; Barbara Devillier; David and Angela McBride; Bert Hargraves; Barney and Crystal Threadgill; David Ray; Gary Herman; Rhonda Glanzer; Chris and Darla Barrow; Dennis Dugat; Laurence Barron; Deanette Lemon; Jill White; Beverly Kiker; Yale Devillier, individually and as Personal Representative of the Estate of Kyle H. Devillier; Charles Monroe; Jacob and Angela Fregia; Jerry and Mary Devillier; Zalphia Hankamer; Larry Bollich; Susan Bollich; Shelia Marino; William Meissner; Taylor McBride; Brian and Kathleen Abshier; Jina Daigle; Coulon Devillier; Hailey Ray Sr., Hailey Ray Jr. and Shelia Moor; John Rhame; Alex and Tammy Hargraves; William Devillier; Kyle and Allison Wagstaff; and Gulf Coast Investments, L.L.C. (collectively "Plaintiffs").

2.      **Removal Provision:** This removal is pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1367(a). Plaintiffs assert a federal inverse condemnation claim under the Takings

clause of the Fifth Amendment to the U.S. Constitution, which invokes this Court's federal-question jurisdiction. *See* Plaintiffs' Original Petition at ¶¶54–70; *see also* 28 U.S.C. § 1441(a); 42 U.S.C. § 1983.1 Plaintiffs also allege an inverse condemnation claim under art. I, sec. 17 of the Texas Constitution against Defendant, which invokes this Court's supplemental jurisdiction. *See* Plaintiffs' Original Petition at ¶¶35–53; *see also* 28 U.S.C. § 1367(a).

3.    **State Action:** On May 26, 2020, Plaintiffs filed an original petition against Defendant in the 253rd Judicial District of Chambers County, Texas, in Cause No. 20-DCV-0300. *See Exhibit 1*. Defendant was served with notice of Plaintiffs' Original Petition on or about May 29, 2020. Defendant filed its Original Answer and Affirmative Defenses on June 22, 2020. Venue is proper in this district under 28 U.S.C. § 1441(a) because the state court where the action has been pending is located in this district and this division.

4.    **Nature of the Lawsuit:** Plaintiffs allege that TXDOT's design, construction, maintenance and operation of IH-10 between Texas State Highway 61 to the west and Chambers County to the east and north to include a concrete median barrier created a dam effect that caused flooding and damages to Plaintiffs' real property north of IH-10 after Tropical Storms Harvey (in 2017) and Imelda (in 2019) in violation of both the U.S. and Texas' Constitutions. *See* Plaintiffs' Original Petition at ¶¶12, 15–32.

---

1 Plaintiffs do not couch their federal inverse condemnation claim as a § 1983 claim. However, § 1983 is the only vehicle by which a constitutional violation, such as an inverse condemnation claim under the Takings Clause of the Fifth Amendment, can be brought against a State or state agency. *See, e.g., Knick v. Township of Scott, Penn.*, 139 S.Ct. 2162, 2170 (U.S., 2019).

5.   **Jury Demand:** Defendant requested a trial by jury in its Original Answer and Affirmative Defenses.

6.   **Removal Requirements of 28 U.S.C. § 1441**: This action is a civil action raising a federal question of which this Court has original jurisdiction under 28 U.S.C. § 1331 and is one which may be removed to this Court by Defendant, pursuant to the provisions of 28 U.S.C. § 1441(a). This action also raises a state-law claim which this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a).

7.   **Compliance with Deadline**: Defendant was served with notice of Plaintiffs' Original Petition on or about May 29, 2020. Defendant has thirty (30) days in which to remove. 28 U.S.C. § 1446(b)(3). Therefore, this removal is timely.

8.   **State Court Pleadings:** Defendant is filing concurrently with this notice, as required by Local Rules and 28 U.S.C. § 1446(a), a true and correct copy of all pleadings obtained by DSHS in the state court action.

ACCORDINGLY, Defendant prays that this cause be removed to the United States District Court for the Southern District of Texas, Galveston Division, pursuant to Sections 1441 and 1446(a) of Title 28 of the United States Code.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

ESTEBAN S.M. SOTO
Chief, Transportation Division


/s/ *Glorieni M. Azeredo*
GLORIENI M. AZEREDO
Assistant Attorney General
Southern Dist. No. 3339635
State Bar No. 24077840
LISA MCCLAIN MITCHELL
Assistant Attorney General
Southern Dist. No. 572948
State Bar No. 90001724
Transportation Division
P.O. Box 12548
Austin, Texas 78711-2548
512-936-1175 (Azeredo)
512-936-1431 (Mitchell)
512-936-0888 – Fax
Email: glorieni.azeredo@oag.texas.gov
Email: lisa.mitchell@oag.texas.gov

COUNSEL FOR DEFENDANT

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on June 29, 2020, a true and correct copy of the foregoing document and all attachments referred to in the notice, have been sent to the following:

<u>**Via E-Serve**</u>
Daniel H. Charest
E. Lawrence (Larry) Vincent
900 Jackson Street, Suite 500
Dallas, Texas 75202
469-904-4550
469-444-5002 – Fax
Via Email: dcharest@burnscharest.com
Via Email: lvincent@burnscharest.com

*Counsel for Plaintiffs*

<u>**Via E-Serve**</u>
Lawrence G. Dunbar
Dunbar Harder, PLLC
10590 West Office Drive, Suite 2000
Houston, Texas 77042
713-782-4646
713-782-5544 – Fax
Via Email: ldunbar@dunbarharder.com

*Counsel for Plaintiffs*

<u>**Via E-Serve**</u>
Charles Irvine
Mary Conner
Irvine & Conner, PLLC
4709 Austin Street
Houston, Texas 77004
713-533-1704
713-524-5165 – Fax
Via Email: charles@irvineconner.com
Via Email: mary@irvineconner.com

*Counsel for Plaintiffs*

/s/ *Glorieni M. Azeredo*
GLORIENI M. AZEREDO
Assistant Attorney General

# EXHIBIT 1

Filed
5/27/2020 12:16 PM
Patti L. Henry
District Clerk
Chambers County, Texas
By: _____ Deputy

20DCV0300

Cause No. _____

| | | |
|---|---|---|
| Richard & Wendy Devillier; Steven & Rhonda Devillier; Barbara Devillier; David & Angela McBride; Bert Hargraves; Barney & Crystal Threadgill; David Ray; Gary Herman; Rhonda Glanzer; Chris & Darla Barrow; Dennis Dugat; Laurence Barron; Deanette Lemon; Jill White; Beverly Kiker; Yale Devillier, Individually and as Personal Representative of the Estate of Kyle H. Devillier; Charles Monroe; Jacob & Angela Fregia; Jerry & Mary Devillier; Zalphia Hankamer; Larry Bollich; Susan Bollich; Sheila Marino; William Meissner; Taylor McBride; Brian & Kathleen Abshier; Jina Daigle; Coulon Devillier; Halley Ray Sr., Halley Ray Jr. & Sheila Moor; John Rhame; Alex & Tammy Hargraves; William Devillier; Kyle & Allison Wagstaff; and Gulf Coast Olive Investments, L.L.C. | § § § § § § § § § § § § § § § § § § § § § § § § § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | | CHAMBERS COUNTY, TEXAS |
| v. | | |
| THE STATE OF TEXAS, | | |
| Defendant. | | 253rd JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION AND REQUEST FOR DISCLOSURES

Plaintiffs Richard & Wendy Devillier; Steven & Rhonda Devillier; David & Angela McBride; Bert Hargraves; Barney & Crystal Threadgill; Barbara Devillier; David Ray; Gary Herman; Rhonda Glanzer; Chris & Darla Barrow; Dennis Dugat; Laurence Barron; Deanette Lemon; Jill White; Beverly Kiker; Yale Devillier, Individually and as Personal Representative of the Estate of Kyle H. Devillier; Charles Monroe; Jacob & Angela Fregia; Jerry & Mary Devillier; Zalphia Hankamer; Larry Bollich; Susan Bollich; Sheila Marino; William Meissner; Taylor McBride; Brian & Kathleen Abshier; Jina Daigle; Coulon Devillier; Halley Ray Sr., Halley Ray Jr. & Sheila Moor; John Rhame; Alex & Tammy Hargraves; William Devillier; Kyle & Allison Wagstaff; and Gulf Coast Olive Investments, L.L.C. ("Plaintiffs") file this Original Petition seeking just compensation under both the Texas and United

PLAINTIFFS' ORIGINAL PETITION AND REQUEST FOR DISCLOSURES                    1

States Constitutions for the taking, damaging, and destruction of Plaintiffs' private property in Chambers County, Texas caused by the design, construction, operation, and maintenance of Interstate Highway 10 by Defendant, the State of Texas during and after Tropical Storms Harvey (2017) and Imelda (2019).

## NEED FOR THIS ACTION

1.      The State of Texas (the "State"), acting through the Texas Department of Transportation ("TxDOT"), designed, constructed, operates, and maintains Interstate Highway 10 ("IH-10"), a major east-west transportation corridor running through the Houston area and the rest of the southern portion of the country. Two of the State's projects in Chambers County that were recently constructed were designed to raise the elevation of IH-10, to widen IH-10 from four to six lanes, and to install a solid concrete traffic median barrier on its centerline to enhance public safety and to facilitate use of its eastbound (southside) lanes as an evacuation route during periods of flooding by confining the overtopping of water to the westbound lanes (northside). The State's installation of an impenetrable bulwark down the center of the elevated IH-10 effectively created a dam, obstructing the natural north/south rainfall runoff flow that would otherwise overtop the roadway and continue to flow downstream, thus creating backwater flooding onto Plaintiffs' properties, which lie north of IH-10 at elevations below the top of this newly constructed dam.

2.      Article I, Section 17 of the Texas Constitution guarantees that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made . . . ." Likewise, the Fifth Amendment to the U.S. Constitution provides "nor shall private property be taken for public use, without just compensation." The virtually unconstrained power of the government to take a citizen's private property without their consent is balanced <u>only</u> by the constitutional guarantee that the government must compensate the owner for taking their property.

6.      The State of Texas had the power to perform its work on IH-10. And that work was for a public purpose, providing transportation for its citizens and those throughout this country. Neither of those propositions can be honestly denied. Through the recent IH-10 projects, however, TxDOT knowingly caused flooding on Plaintiffs' property in exchange for enhancing public safety and providing an evacuation route during periods of flooding that would otherwise cause overtopping of the roadway. But the constitutional protections, both at the state and federal level, mandate that Plaintiffs are not forced to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. Plaintiffs are entitled to just compensation for this taking and, accordingly, seek the Court's protection to enforce their constitutional rights.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over Plaintiffs' claims under Tex. Prop. Code § 21.001. Plaintiffs' claims are each within the jurisdictional limit of this Court. Venue is proper in this Court pursuant to Tex. Civ. Prac. & Rem. Code § 15.011.

## DISCOVERY LEVEL

8.      Plaintiffs request this cause be governed by Texas Rule of Civil Procedure 190.4 and will seek entry of a Level 3 scheduling order for the action.

## REQUEST FOR DISCLOSURES

9.      Plaintiffs request Defendant, the State of Texas, disclose the information as substantively and procedurally required by Tex. R. Civ. P. 194.

## PARTIES

10.      The following individuals and entities are **Plaintiffs** in this action: Richard & Wendy Devillier; Steven & Rhonda Devillier; David & Angela McBride; Bert Hargraves; Barney & Crystal Threadgill; Barbara Devillier; David Ray; Gary Herman; Rhonda Glanzer; Chris & Darla Barrow; Dennis Dugat; Laurence Barron; Deanette Lemon; Jill White; Beverly Kiker; Yale Devillier,

Individually and as Personal Representative of the Estate of Kyle H. Devillier; Charles Monroe; Jacob & Angela Fregia; Jerry & Mary Devillier; Zalphia Hankamer; Larry Bollich; Susan Bollich; Sheila Marino; William Meissner; Taylor McBride; Brian & Kathleen Abshier; Jina Daigle; Coulon Devillier; Halley Ray Sr., Halley Ray Jr. & Sheila Moor; John Rhame; Alex & Tammy Hargraves; William Devillier; Kyle & Allison Wagstaff; and Gulf Coast Olive Investments, L.L.C.

11.     Each Plaintiff owns and/or leases real and personal property located in a roughly rectangular area of Chambers County, Texas delineated on the west by Texas State Highway 61, on the north and east by the Chambers County line, and on the east and south by IH-10 (hereafter the "Operative Geographic Area"), which is depicted below.





12.     Each Plaintiffs' property lies below the lowest point of elevation reached by the top of the traffic median barriers installed by the State of Texas on the center line of IH-10, dividing the

east-west lanes of traffic in the vicinity of the Plaintiffs' properties where overtopping of this barrier would first occur. Plaintiffs owned or leased their property at the time they suffered devastating flooding during the last two Tropical Storms - Harvey (August 2017) and Imelda (September 2019). As a result, Plaintiffs' properties were inundated, taken, destroyed, and/or damaged by the State of Texas by its design, construction, operation, and/or maintenance of IH-10.

13.     And the State (a) knew that its actions would cause or were causing damage to Plaintiffs' properties; (b) knew that the damage to Plaintiffs' properties was substantially certain to result from its actions; and/or (c) knew or should have known that the inundation of Plaintiffs' properties was the natural, probable, and foreseeable consequence of its acts. The constitutional protections against governmental takings entitle Plaintiffs to compensation for the inundation, taking, damaging, and/or destruction of their property.

**Defendant**

14.     Defendant, the State of Texas, is a sovereign entity and body politic with the power of eminent domain and constitutional liability for the taking, damaging, and/or destruction of private property without payment of just or adequate compensation. Defendant answers for its agencies, including but not limited to the Texas Department of Transportation, and may be served by service on Ruth Hughs, the Texas Secretary of State, at 1100 Congress Avenue, Capitol Building Room 1E.8, Austin, Texas 78701.

**FACTS COMMON TO ALL CLAIMS**

15.     For years, the TxDOT has known that the solid concrete traffic median barrier/dam it erected down the middle of IH-10 would block the overtopping of excess rainfall runoff trying to cross over the roadway and cause the flooding of and significant damage to Plaintiffs' real and personal property. And even so, TxDOT continues raising the impermeable traffic barrier/dam,

extending it further east down the center of the highway <u>despite</u> knowing of the damage caused to Plaintiffs' properties by the rainfall runoff it blocks.

**I.    The State of Texas has Installed an Impenetrable Solid Concrete Traffic Barrier on the Centerline of Interstate Highway 10 that Operates as a Dam, Blocking Rainfall Runoff Coming from the North that wants to Overtop the Highway Centerline, Backing up Water to the North, and Flooding Plaintiffs' Properties.**

16.    In 1956, President Dwight D. Eisenhower signed the Federal-Aid Highway Act into law, allocating billions of dollars for the construction of the Interstate Highway System (the "System"), which, in present day, includes IH-10. The Federal Highway Administration dispenses funds to state governments, which in turn build and maintain the System within their respective boundaries. In turn, the states must follow federal regulations that govern the building and maintenance of the System—including any impact of a particular project's design and operation on the hydrology (rainfall runoff characteristics) of the surrounding property.

17.    As part of Federal Aid Project IR 10-8(134)824, TxDOT significantly raised the elevation of IH-10 from the height of its "Existing Concrete Pavement" to a new "PROPOSED PROJECT P.G.L."



18.     In addition, TxDOT erected a precast concrete barrier ("CTB TYPE 2") in the median between the east/west lanes of IH-10. The barrier was installed in sections thirty feet (30') long, each weighing approximately seven (7) tons and rising thirty-two inches (32") above the now-elevated grade level of the traffic lanes. And, importantly, the 30-foot sections are grouted together so as to form a complete seal.



**DETAILS OF BARRIER SHAPE**

19.     Later, pursuant to Federal Aid Project NH 1602(470), TxDOT designed and is constructing another set of improvements to IH-10. These plans include the erection of a thirty-two-inch (32") permanent concrete traffic barrier down the centerline of a now-elevated highway.



Construction of Project NH 1602(470), including erection of the 32-inch high, solid median barrier down the centerline of IH-10, continues to this day as the work proceeds easterly.

20.     Unlike other segments of IH-10, the miles of median barrier in the Operative Geographic Area does not have slots at the base that would otherwise allow water to pass between the north and south sides. instead, the median barrier is completely solid.



21.     The functional effect of installing such solid median barriers on elevated highways is to create a dam that blocks stormwater runoff on the north side of the centerline of IH-10, east of State Highway 61 in Chambers County, which backs up and stores water at or below the elevation of the top of the barrier/dam on private property within the Operative Geographic Area.

22.     TxDOT's design, construction, and maintenance of these barriers/dams was no mistake. Rather, the barriers/dams—in addition to maintaining traffic safety—keep the southern portion (eastbound lanes) of IH-10 open during severe rainfall events that would otherwise overtop

the roadway and prevent all traffic from using this major traffic corridor. And, while the public generally benefits from the access to transportation along at least a portion of this roadway during such rainfall events, the burden of that benefit falls exclusively on Plaintiffs within the Operative Geographic Area who are forced to store such waters on their property without their permission.

23.     For example, in August 2017, Tropical Storm Harvey brought its rainfall to much of southeast Texas, including Chambers County. During and after Harvey, the IH-10 median barrier functioned as a leak-proof dam, blocking rainfall runoff from overtopping the entire roadway and backing water up on the north side.

24.     While performing its public functions of providing a safety barrier separating the traffic flow and keeping the eastbound traffic lanes open, the IH-10 median barrier backed up and detained storm water runoff on private property within the Operative Geographic Area and caused extreme damage to Plaintiffs' properties.



25.     Likewise, in September 2019, TxDOT's median barrier/dam along IH-10 blocked rainfall runoff from overtopping the roadway during and after Tropical Storm Imelda. Again, eastbound traffic lanes remained open and conferred a benefit to the public at large. And, again, the blocked storm runoff water backed up and flooded and severely damaged Plaintiffs' property.



26.     The damage and destruction of Plaintiffs' real and personal property was the intended, direct, natural, and/or foreseeable result of State-authorized affirmative action done for a public purpose—namely, the design, construction, operation, and maintenance of IH-10.

27.     Nor were Harvey or Imelda "rare" or "unprecedented" rain events for this region of southeast Texas. The history of hurricanes, tropical storms, and large frontal storms that have released significant amounts of rainfall in the area is well documented. The permanent placement of an impenetrable traffic median barrier/dam down the center of IH-10 guarantees that the flooding of Plaintiffs' properties will inevitably reoccur, like when Imelda followed Harvey only two years later.

28.     Each Plaintiff owned homes, fixtures, businesses, and personal property protected from the taking, damaging, or destruction by the State without compensation. The flooding suffered by each Plaintiff interfered with the ability to use their land and personal property for their intended purposes. Plaintiffs had reasonable expectations that they would be able to occupy and use their homes, businesses, and personal property for the purposes and in the manner for which they were purchased or leased. But the backwater stored onto each Plaintiff's property severely interfered with their reasonable investment-backed expectations regarding the occupancy and use of their property. Many Plaintiffs were displaced from their homes and had to stay in hotels or alternative accommodations following Harvey and Imelda due to this government-induced flooding.

29.     Portions of Plaintiffs' homes and other improvements have been damaged and/or destroyed, necessitating the tearing out of soiled walls, removing mold-prone insulation, replacing ruined floors, replacing garage doors and other exterior features, and requiring the repair of a vast array of structural components. Moreover, many Plaintiffs' properties suffered significant erosion and loss of crops, grasses, and groundcover essential to the use to which Plaintiffs had put the properties. And those Plaintiffs using their property for commercial purposes were deprived of the use of, and temporarily any access to, their property, losing the benefits and profits attendant to the continued operation of their commercial ventures.

30.     In addition to the damage and loss of access to their real property, Plaintiffs suffered the permanent damage and destruction of personal property including appliances, furniture, tools, machinery, livestock, crops, vehicles, and the tragic loss of personal effects and mementoes which can never be replaced. For many Plaintiffs, the loss amounted to most of their possessions.

31.     The impoundment of rainwater runoff on Plaintiffs' property for days on end, destroying Plaintiffs' real and personal property and denying them access to that property, is not something Plaintiffs expected or reasonably could have expected when purchasing and developing

their property. Many of these tracts have been owned by Plaintiffs' forebearers and family members for decades without having been subject to flooding of the nature, character, extent, and duration as they experienced after TxDOT built the barriers/dams along the elevated IH-10.

32.     The following summarizes the foundation of the claims presented:

a.     each Plaintiff owned and/or leased real and personal property located north of IH-10 in Chambers County, Texas that lies below the lowest point of elevation reached by the top of the traffic median barriers/dams installed by TxDOT through the middle of IH-10;

b.     each Plaintiffs owned and/or leased the above-referenced property at the time the property suffered devastating flooding during Tropical Storms Harvey (August 2017) and Imelda (September 2019);

c.     each Plaintiffs' real and personal property was inundated, destroyed, and/or damaged as a result of the affirmative actions of the State in designing, constructing, operating, and/or maintaining the configuration of IH-10; and

d.     each Plaintiffs' property was damaged by State actions which either (a) the State knew would result from its actions, (b) the State knew were substantially certain to result from its actions, and/or (c) were the natural, probable, and/or foreseeable consequence of the State's affirmative acts; and

e.     each Plaintiff, as a consequence of the foregoing, is entitled to recovery of just compensation for the losses suffered by the taking, damaging, and/or destruction of their real and personal property.

33.     Per Tex. R. Civ. P. 47, each Plaintiff seeks recovery of compensation in an amount greater than $1 million.

## CAUSES OF ACTION

34.     While the standards (and controlling authority) governing Plaintiffs' inverse condemnation claims under the Texas and U.S. Constitutions differ, the facts in this case mandate that the State compensate Plaintiffs under both constitutional provisions.

**COUNT 1:**     **Violation of Article I, Section 17 of the Texas Constitution for the Taking, Damaging, or Destruction of their Property.**

35.     Plaintiffs re-allege and incorporate the preceding paragraphs of this Original Petition.

36.     To establish a claim under Article I, Section 17, a property owner must show that there has been: (1) an intentional government act by a government entity; (2) that resulted in the taking, damaging, or destroying of a property owner's property; and (3) for public use. Plaintiffs' claims fulfill each of these requirements.

### A.     The Design, Construction, Operation, and/or Maintenance of IH-10 Constitutes a Public Use.

37.     The design, construction, operation, and/or maintenance by the State of Texas of Interstate Highway 10 constitutes a "public use" for purposes of Plaintiffs' inverse condemnation claims.

38.     The State of Texas has recognized that public highway projects to facilitate interstate travel fall within the meaning of "public use." Therefore, Plaintiffs, who are owners of property protected by the Texas Constitution, may bring a claim for just or adequate compensation for their property which has been taken, damaged, and/or destroyed  by the design, construction, operation, and/or maintenance of IH-10.

### B.     The Design, Construction, Operation, and/or Maintenance of IH-10 Caused the Flooding of Plaintiffs' Properties.

39.     The Texas Supreme Court has recognized that compensation for the taking, damaging or destruction of private property is in order if an injury results from either the construction of public works or their subsequent maintenance and operation. The erection of IH-10, and its subsequent operation and maintenance, by the State that caused the flooding of Plaintiffs' property is an invasion for which compensation is required.

### C.     The State Intentionally Caused Damage to Plaintiffs' Properties.

40.     Finally as to Plaintiff's claim under Article I, Section 17 of the Texas Constitution, the element of intent is shown where the governmental entity that physically damages private property to confer a public benefit (1) knows that a specific act is causing identifiable harm; or (2) knows that the

specific property damage is substantially certain to result from an authorized government action—that is, that the damage is necessarily an incident to, or necessarily a consequential result of, the government's action. Both of those standards are met here.

> **1.     The State had actual knowledge that its actions caused damage to Plaintiffs properties, and that the maintenance and operation of its public improvements would do so again.**

37.     The State was aware at the time it designed, constructed, operated, and/or maintained the IH-10 projects that its actions would cause physical damage to Plaintiffs' private property. As the Texas Supreme Court has noted, "There may well be times when a government entity is aware that its action will necessarily cause physical damage to certain private property, and yet determines that the benefit outweighs the harm caused to that property. In such a situation, the property may be damaged for public use."

38.     That is precisely what occurred during both Tropical Storms Harvey and Imelda. Plaintiffs' properties experienced greater flooding, and for a greater period of time, than ever before because of the backwater effect from the IH-10 projects—as the State knew would happen.

39.     Prior to August 2017, Plaintiffs' properties suffered short-lived, intermittent flooding from heavy rainfall events, but the storm's runoff was able to (and did) naturally flow south over IH-10 and ultimately down to the Gulf of Mexico. During Tropical Storm Harvey, however, Plaintiffs experienced significantly greater flooding of (and damage to) their properties, and the inundation lasted for a greater period of time—well after Harvey had moved on—than ever before because the rainfall runoff was retained behind the elevated and improved IH-10.

40.     Recognizing the impact of the *de facto* dam formed by the elevated highway with its impermeable traffic median barrier, some Plaintiffs contacted State officials (including officials at TxDOT) and <u>told</u> them of the damage caused to their properties by the State's actions. But the State did nothing to alleviate the problem. Indeed, the State has <u>continued</u> its ongoing modifications to IH-

10, extending even further the impenetrable barrier down the center of the highway despite having been alerted to the damage caused by the inundation of properties by the rainfall runoff it retained. It was only a matter of time before the State's action submerged Plaintiffs' properties again.

41.     And that time soon came. In September 2019, Tropical Storm Imelda deluged Chambers County, and again the State's traffic barrier arrested the rainfall runoff. Even though the State had been previously told of the damage caused during Harvey by the weir it had erected in the middle of IH-10, the State had continued its operation and maintenance of the highway and persisted with the erection of the impermeable barrier as well.

42.     As Imelda approached, one Plaintiff – Steven Devillier – sought to prevent a repeat of the devastation wreaked by Harvey. Devillier asked government officials for permission to remove some of the barrier, but when his request was relayed to TxDOT, it was denied. As the Beaumont Enterprise related the story:

> "[Steven] Devillier lives near Winnie in Chambers County, on the north side of Interstate 10. When Hurricane Harvey struck the region in 2017, a solid concrete barrier that divides the freeway's eastbound and westbound lanes had acted like a dam, holding back water headed toward the Gulf of Mexico.
>
> …
>
> Since Harvey, Devillier says, he had been trying to get something done about the freeway partition. Could the divider be redesigned to allow water to flow through? Could drainage underneath be improved?
>
> The barrier seemed to hold back water to the north, swamping the freeway lanes headed toward Houston. The build-up, he believes, caused his and other homes to be inundated, family members included. The freeway was closed for three days.
>
> Devillier says he and his cousin petitioned authorities for change that didn't come fast enough.
>
> As Imelda bore down, Devillier begged the Chambers County judge for permission to demolish the barrier with a trackhoe, he said. The county engineer said officials passed the request to the Texas Department of Transportation, believing it was not the county's decision to make.
>
> TxDOT, according to a spokesperson, had been working with University of Texas researchers to study how the barrier affected flood-prone areas. The agency wasn't ready to see the barricade immediately taken down.

The barrier kept the eastbound lanes of the freeway open, spokesperson Sarah Dupre wrote in an email, allowing authorities to reach an otherwise sealed-off Winnie.

Devillier's property, along with thousands of additional acres north of the IH-10 barrier, was thereafter flooded by rainfall runoff from Imelda retained by its Projects.

43.     Because of the benefits to the general public, including the enhanced safety and the creation of an evacuation route via the eastbound lanes of the freeway, the State has chosen to construct and maintain the operation of IH-10 *with* the barrier. That intentional choice by the State has forced Plaintiffs to bear the burden of providing those public benefits, and they are entitled to compensation for their losses.

> **2.     The State possessed knowledge that damage to Plaintiffs' properties was substantially certain to result from its actions.**

44.     Because the State actions that form the basis of Plaintiffs' claims were public works performed pursuant to Federal Aid Projects IR 10-8(134)824 and NH 1602(470), compliance with the federal and state rules and regulations applicable to that work was mandatory. The analyses, studies, and documentation required by those rules and regulations provide objective evidence that the State knew harm to Plaintiffs' properties was substantially certain to result from its actions.

45.     Because the TxDOT projects cross land that the Federal Emergency Management Agency ("FEMA") has designated as a Special Flood Hazard Area ("SFHA"), i.e. being in the 100-year floodplain, the National Flood Insurance Act required the following actions which would generate objective evidence that damage to Plaintiffs' properties was substantially certain to occur:

  a.   A full hydrologic and hydraulic analysis and coordination with the Floodplain Administrator for Chambers County;

  b.   A comparison of the flood footprint of the project's design hydraulic analysis with the FEMA Flood Insurance Rate Map Zone footprint, and any serious discrepancies explored; and

  c.   If any rise in the base flood elevation results which extends beyond the project right of way, a discussion with the Chambers County Floodplain Administrator

is required to make sure the rise is acceptable—and any rise that could cause damage to properties <u>cannot</u> be acceptable.

46.　　Similarly Presidential Executive Order 11988 requires each actor, in carrying out federal programs, (1) to reduce the risk of flood loss, to minimize the impact of floods on human safety, health and welfare, and to restore and preserve the natural and beneficial values served by floodplains; and (2) to evaluate the potential effects of any actions in a floodplain to ensure its planning programs reflect consideration of flood hazards and floodplain management and to consider alternatives that will not impact a floodplain. Additional federal regulations required the State to implement Federal Aid Projects IR 10-8(134)824 and NH 1602(470) in a manner (a) to prevent uneconomic, hazardous, or incompatible use and development of floodplains; (b) to avoid, where practicable, encroachments by its actions; (c) to minimize the adverse impacts its actions may have on base floodplains, including direct or indirect support for development; and (d) to preserve the natural and beneficial floodplain values that are adversely affected by such actions.

47.　　And Title 23, Subpart A of the U.S. Code of Federal Regulations ("Subpart A"), which sets forth Federal Highway Administration ("FHWA") policies and procedures for the hydraulic design of encroachments on floodplains for highway projects, applies to the Federal Aid projects and thus required TxDOT to prepare location hydraulic studies for each Project that would include a discussion of (a) the hydraulic risks associated with implementation of the action, (b) the impacts from the action on natural and beneficial floodplain values, (c) the support of probable incompatible floodplain development, (d) the measures to minimize floodplain impacts associated with the action, and (e) the measures to restore and preserve the natural and beneficial floodplain values impacted by the action, along with an evaluation and discussion of the practicability of alternatives to any longitudinal encroachments. Again, TxDOT's understanding of and need for compliance with these regulations created objective evidence of the State's knowledge of the damage to Plaintiffs' properties that would occur from its actions regarding IH-10.

PLAINTIFFS' ORIGINAL PETITION AND REQUEST FOR DISCLOSURES　　　　　　17

48.     Finally, several Texas state statutes and regulations, including TxDOT's own rules and policies, require an investigation, analysis, and documentation that provide objective evidence of the State's knowledge of the expected flooding of Plaintiffs' properties created by the State's actions.

### 3.   Subjective knowledge by the State that its action will cause specific harm to a specific piece of property should not be required to recover on a Takings claim under the Texas Constitution.

49.     As shown below in Count 2, the intent or knowledge requirement to demonstrate a taking under the Texas Constitution differs from the showing a party needs to make to recover under the Fifth Amendment to the U.S. Constitution. Given the recent change in Takings jurisprudence by the U.S. Supreme Court, any difference should be eliminated.

50.     The rights and protection accorded Texas property owners under the State constitution's takings provision should <u>not</u> provide less security against having their property taken without just compensation than its federal counterpart.

51.     The ability of a property owner to litigate both a Fifth Amendment Takings claim and a claim under Article I, Section 17 of the Texas Constitution in the same suit should bring the intent standard applicable to each in harmony so that an unnecessary and perfidious dichotomy between the state and federal claims is eliminated.

52.     Therefore, if it is discovered the State did not comply with the mandates of federal and state law, regulations, and policy, the State's reckless disregard of facts which it had a duty to investigate should support a finding of the requisite intent for a Takings claim involving the flooding of private property. Government actors should be treated the same as other litigants vis-à-vis how the element of "intent" is applied under Texas law when that element is adjudicated in an action to which they only are subject—a Takings claim. Therefore, Plaintiffs bring their nonfrivolous argument for the extension, modification, or reversal of existing Texas law.

53.      Therefore, Plaintiffs seek recovery of just and adequate compensation pursuant to Article I, Section 17 of the Texas Constitution for the permanent and/or temporary taking, damaging, and/or destruction of their real and personal property.

**COUNT 2:      The Taking of Property Without Just Compensation in Violation of the Fifth Amendment to the United States Constitution.**

54.      Plaintiffs re-allege and incorporate the preceding paragraphs of this Original Petition.

55.      In addition to, and in the alternative to, their claim under the Texas Constitution, Plaintiffs seek recovery for the State's permanent and/or temporary taking of their real and personal property without paying just compensation in violation of the Takings Clause of the Fifth Amendment of the U.S. Constitution.

56.      Federal law directs that whether government-induced increased water runoff onto private property constitutes a taking by inverse condemnation under the Fifth Amendment is determined by a two-question test: (1) did the Plaintiff possess a protectable property interest in what they allege the government has taken, and (2) were the effects the Plaintiff experienced the predictable result of governmental action which was sufficiently substantial to justify a takings remedy. Here the answer to both those questions is yes.

57.      Each Plaintiff suffered flooding of their property greater than ever before after TxDOT built the barriers/dams along the elevated IH-10.

58.      The State should not force Plaintiffs alone to bear the burdens of providing increased highway safety and an emergency evacuation route which, in all fairness and justice, should be borne by the public as a whole.

**A.      Each Plaintiff Possesses a Property Interest Protected Under the Fifth Amendment Against Being Taken by the State Without Just Compensation.**

59.      The existence of a protectable property interest under the Fifth Amendment is determined by reference to state law. Texas law recognizes that the term property, as it applies to

PLAINTIFFS' ORIGINAL PETITION AND REQUEST FOR DISCLOSURES            19

takings law, means not only the thing owned, but also every right which accompanies ownership. Each Plaintiff has protected property rights which have been taken by the State's actions.

**B.    The Effects Each Plaintiff Experienced were the Predictable Result of the State's Action and were Sufficiently Substantial to Justify a Takings Remedy.**

60.    An analysis of the six factors examined when determining the second part of a federal Takings claim shows that not only was the flooding Plaintiffs experienced the predictable result of the State's action, but also the effects suffered were sufficiently substantial to constitute a taking.

**1.    The time and duration of the invasion.**

61.    Because Plaintiffs' properties were physically invaded by the flooding from the Projects (whether temporarily or permanently), the temporal element of the federal analysis is used only to determine the measure of just compensation under the Fifth Amendment, not whether a claim arose at all. This element is not relevant to the takings analysis.

**2.    The severity of the interference.**

62.    Plaintiffs meet the severity burden since their real and personal property interests have been subjected to an invasion that destroyed and/or completely precluded each Plaintiffs' access to, right to use, and enjoyment of their property. This element supports the finding of a taking.

**3.    Plaintiffs' properties were flooded by the State's actions.**

63.    The question presented by the third factor is whether the invasion of Plaintiffs' properties was caused by the State's action; in essence, a comparison of the results from government-authorized actions for a public purpose with what the result would have been without or "but for" those government-authorized actions. Plaintiffs' properties are located behind a permanent structure that blocks and backs up rainfall runoff at a level that floods those properties. The inundation of Plaintiffs' properties was the direct, natural, and foreseeable result of authorized activities by the State in furtherance of a public purpose: the design, construction, operation, and maintenance of IH-10.

"But for" the State-authorized action, Plaintiffs' properties would not have been flooded in the manner and to the extent they were flooded, so this factor supports finding a taking.

### 4. The degree to which the invasion was intended.

64.     The intent to find a taking under the Fifth Amendment is shown by evidence that the plaintiffs' injuries were the direct, natural, or probable result of the authorized government action. It is not necessary to show that the State subjectively intended to take any Plaintiff's property, only that the flooding of Plaintiffs' land was the natural and probable consequence of the State's acts. Here the FEMA floodplain maps clearly showed that rainfall runoff form large storm events overtop this roadway in the vicinity of the Plaintiffs' properties, such that elevating and constructing a solid barrier/dam across the median of the roadway would obviously block and back up the water attempting to overtop and flow across the road surface.  Because an analysis by the State of the hydrological impact that would be caused by the placement of such a dam in the center of IH-10 in northeast Chambers County would have only confirmed this blocking and the flooding that invaded and appropriated Plaintiffs' property, this factor supports finding a taking.

### 5. The character of the land at issue.

65.     Plaintiffs' properties are homes, farms, ranches, and businesses whose use is grossly inconsistent with—and exceptionally vulnerable to—significant damage from flooding of the kind and severity experienced because of the TxDOT IH-10 Projects. The character of the land, as reflected in its use by Plaintiffs, supports finding a taking.

### 6. Plaintiffs' reasonable investment-backed expectations.

66.     Finally, the State's actions ran counter to, and severely interfered with, Plaintiffs' reasonable investment-backed expectations in the safety and security of the residential and commercial properties that they rented or owned, as well as the use and enjoyment of their personal property destroyed by the subject flooding. This factor supports finding a taking.

67.     When Plaintiffs acquired their property interests, they did not expect that a new hydrologic landscape would be created by the State implementing a *de facto* flood control effort that did not exist, or was not evident, when they purchased or leased their real properties. Most of the Plaintiffs have invested their life savings into their properties without any expectation of the flood certainty that the State has created. And the State-created flooding has severely impacted the economically viable and productive use of the land, further decimating Plaintiffs' reasonable investment-backed expectations. This factor too supports finding a taking.

**C.     The State's Physical Invasion of Each Plaintiffs' Property, Depriving them of the Use, Enjoyment, Exclusive Possession and Right to Alienate their Property, Independently Constitutes a Taking Under the Fifth Amendment.**

68.     Federal case law also directs that the analytical test used to determine whether there has been a taking can be assessed through the conceptual framework applicable to the claim.

69.     Generally, the government can take property by two means: physically or by regulation. Both types of takings can be further divided into two categories: categorical and non-categorical. Categorical takings deprive the owners of all economically viable use of their property. Non-categorical takings, on the other hand, deprive the owner of some amount of the economic use of the property (either through physical invasion or onerous regulation). Furthermore, a taking can be either permanent or temporary in duration.

70.     Here, Plaintiffs' properties were physically invaded by rainfall runoff the state stored on their land, in their homes, and/or in their businesses. The inundation itself lasted for a several days, and that was followed by a long period of cleanup, replacement, and repair after both Harvey and Imelda. Indeed, some properties were not completely repaired after Harvey when Imelda struck, and some remain unfinished to this day. The flooding effected (1) a temporary categorical physical taking of their real property; (2) a permanent non-categorical physical taking of a flowage easement

over their real property, and (3) a permanent categorical physical taking of their personal property.

Each Plaintiff seeks just compensation for the taking of their property without just compensation.

**PRAYER**

Plaintiffs pray that the Court enter judgment in Plaintiffs' favor finding that Plaintiffs are

entitled to recovery based on the allegations above in an amount to be determined by the trier of fact,

and award Plaintiffs all other relief this Court is empowered to provide and to which Plaintiffs show

themselves entitled.

Dated: May 26, 2020.

Respectfully submitted,

Daniel H. Charest
SBN: 24057803
E. Lawrence (Larry) Vincent
SBN: 20585590
900 Jackson Street, Suite 500
Dallas, Texas 75202
469-904-4550/469-444-5002 (fax)
dcharest@burnscharest.com
lvincent@burnscharest.com

Charles Irvine
SBN: 24055716
Mary Conner
SBN: 24050440
IRVINE & CONNER, PLLC
4709 Austin Street
Houston, Texas 77004
713-533-1704
713-524-5165 (fax)
charles@irvineconner.com
mary@irvineconner.com

Lawrence G. Dunbar
SBN: 06209450
DUNBAR HARDER, PLLC
10590 West Office Drive, Suite 2000
Houston, Texas 77042
713-782-4646
713-782-5544 (fax)
ldunbar@dunbarharder.com

*Counsel for Plaintiffs*

PLAINTIFFS' ORIGINAL PETITION AND REQUEST FOR DISCLOSURES          23