# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| RICHARD & WENDY DEVILLIER, et al., Plaintiffs, individually and on behalf of all other persons similarly situated, | § § § § | Civil Action No. 3:20-cv-00223 |
| v. | § § | Jury Trial Demanded |
| THE STATE OF TEXAS, Defendant. | § § § | |

## FIRST AMENDED MASTER COMPLAINT

Richard & Wendy Devillier; Steven & Rhonda Devillier; David & Angela McBride; Bert Hargraves; Barney & Crystal Threadgill; Barbara Devillier; David Ray; Gary Herman; Rhonda Glanzer; Chris & Darla Barrow; Dennis Dugat; Laurence Barron; Deanette Lemon; Jill White; Beverly Kiker; Yale Devillier, Individually and as Personal Representative of the Estate of Kyle H. Devillier; Charles Monroe; Jacob & Angela Fregia; Jerry & Mary Devillier; Zalphia Hankamer; Larry Bollich; Susan Bollich; Sheila Marino; William Meissner; Taylor McBride; Brian & Kathleen Abshier; Jina Daigle; Coulon Devillier; Halley Ray Sr., Halley Ray Jr. & Sheila Moor; John Rhame; Alex & Tammy Hargraves; William Devillier; Kyle & Allison Wagstaff; Kevin Sonnier; Eugenia Molthen; Bradley Moon; John Roberts; Marilyn Roberts; Savanna Sanders; Robert & Tracey Brown; Josh Baker; Lee Blue; Russell Brown; Margaret Carroll; Kevin Cormier; James & Melissa Davis; Maria Gallegos & Christopher Ferguson; Angela Hughes; Robert Laird; Harold Ledoux; Kacey Sandefur; Tifani Staner; Stephen Stelly; Randall & Patti Stout; Chris Day; Calvin Hill; Michael & Julie Weisse; Eleanor Leonard; Ivy Hamm Claude Roberts; Bryan Olson; Caren Nueman; Floyd Cline, Jr.; Kenneth Coleman; Haylea Barrow; Carol Roberts; Jenica Vidrine; Charles Collier; Sharon Crissey; James Brad Crone; Heather & James Coggin; Clovis Melancon; Leroy Speights; Crossroads Asphalt Preservation, Inc.; Fesi Energy, LLC; Brian Fischer; and Curtis Laird; Devon Boudreaux; Richard Belsey; Sharon Clubb; Janet Dancer;

Porter May; Cindy Perez; Cecile Jimenez; Scott Hamric; Bruce & Tina Hinds; William Olivier; Esteban Lopez; Billy Stanley; Candace Abshier; Sean Fillyaw; Autumn Minton; Brandon Sanders; Rodney Badon; Charlie Carter; Myra Wellons; Jerry Stepan; Bryan Mills; Cat 5 Resources LLC; Jeffrey; Randy & Monica Brazil; Herbert & Kerry Dillard; Southeast Texas Olive, LLC; and Gulf Coast Olive Investments, LLC (each an "Individual Plaintiff") appear individually and on behalf of all persons similarly situated (collectively the "Class Plaintiffs"), and respectfully submit this Master Complaint[1] seeking declaratory and injunctive relief, as well as just compensation, under both the Texas Constitution and the United States Constitution for the taking of, damage to, and destruction of private property by Defendant, the State of Texas (the "State") by and through the design, construction, operation, and maintenance of Interstate Highway 10 ("IH-10").

## NEED FOR ACTION

1.      The State, acting through the Texas Department of Transportation ("TxDOT"), designed, constructed, operates, and maintains IH-10, a major east-west transportation corridor running through Houston and the southern portion of the United States.

2.      The State's recent construction of projects in Chambers County and Jefferson County are designed to raise the elevation of IH-10, to widen IH-10 from four to six lanes, and to install a solid concrete traffic median barrier down IH-10's centerline to enhance public safety and facilitate use of its eastbound (southside) lanes as an evacuation route during periods of flooding by confining water to the westbound lanes (northside).

---

[1] By order (ECF #41), the cases of *Sonnier v. State*, No. 3:20-cv-00379; *Boudreaux v. State*, No. 4:21-cv-01521; and *Southeast Texas Olive, L.L.C. v. State*, No. 3:21-cv-00104; were consolidated into this action for all purposes. By the same order (ECF #41), the Court granted plaintiffs leave to file a "Master Complaint" with respect to the consolidated actions.

3.      The State's installation of an impenetrable bulwark down the center of the elevated IH-10 effectively created a weir,[2] obstructing the natural flow of rainfall runoff. As a result, and consistent with the projects' design and the State's intent, the State flooded Class Plaintiffs' real and personal property. At no point did the State compensate Class Plaintiffs, or their predecessors-in-interest, for any right to utilize their private property as a detention area for storm water runoff. Nor did Class Plaintiffs give the State permission to do so.

4.      The actions by TxDOT to enhance public safety and the capacity of IH-10, to provide an evacuation route via its eastbound lanes, and to retain stormwater runoff and prevent the flooding of property south of the highway, all of which caused the flooding of the Individual Plaintiffs' and Class Plaintiffs' properties, were public projects; likewise, the actions were undertaken, paid for, overseen, and effected by the State for public use and to further a public purpose.

5.      The virtually unconstrained power of the government to take a citizen's private property without their consent is balanced only by the constitutional guarantee that the government must compensate the owner for taking their property. Article I, Section 17 of the Texas Constitution guarantees that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made . . . ." Likewise, the Takings Clause of the Fifth Amendment to the U.S. Constitution (made applicable to the States through the Fourteenth Amendment) provides "nor shall private property be taken for public use, without just compensation."

6.      These constitutional protections, both at the state and federal level, mandate that Class Plaintiffs should not be forced to bear those burdens which, in all fairness and justice, should be borne

---

[2] A weir is defined as "[a] dam placed across a river or canal to raise or divert the water . . . or to regulate or measure the flow." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE at 2025 (3d ed. 1992). Here, the term is used in its "more general definition in engineering to apply to any hydraulic control structure that allows water to flow over its top, often called its crest." *What is a Weir*, PRACTICAL ENGINEERING, https://practical.engineering/blog/2019/3/9/what-is-a-weir.

by the public as a whole. Through the recent IH-10 projects, however, TxDOT knowingly and intentionally caused the flooding of each Class Plaintiffs' property.

7.      The Individual Plaintiffs seek to represent on a class-wide basis all persons who own or lease real or personal property located north of Interstate Highway 10 that has been flooded with water retained by the State's design, construction, operation, and maintenance of the highway. As required by Federal Rule of Civil Procedure 23, the specific definition of the class certified will be determined by the Court.

**JURISDICTION AND VENUE**

8.      This Court has both subject matter jurisdiction over the Individual and Class Plaintiffs' claims under 28 U.S.C. § 1331, § 1441, and § 1367.

9.      This Court has personal jurisdiction over the State of Texas and the State's sovereign immunity from suit for all claims and all Plaintiffs has been waived by the removal by the State of the original actions filed by these Plaintiffs to this Court.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

**PARTIES**

11.     The following are Individual Plaintiffs in this action: Richard & Wendy Devillier; Steven & Rhonda Devillier; David & Angela McBride; Bert Hargraves; Barney & Crystal Threadgill; Barbara Devillier; David Ray; Gary Herman; Rhonda Glanzer; Chris & Darla Barrow; Dennis Dugat; Laurence Barron; Deanette Lemon; Jill White; Beverly Kiker; Yale Devillier, Individually and as Personal Representative of the Estate of Kyle H. Devillier; Charles Monroe; Jacob & Angela Fregia; Jerry & Mary Devillier; Zalphia Hankamer; Larry Bollich; Susan Bollich; Sheila Marino; William Meissner; Taylor McBride; Brian & Kathleen Abshier; Jina Daigle; Coulon Devillier; Halley Ray Sr., Halley Ray Jr. & Sheila Moor; John Rhame; Alex & Tammy Hargraves; William Devillier; Kyle & Allison Wagstaff; Kevin Sonnier; Eugenia Molthen; Bradley Moon; John Roberts; Marilyn Roberts;

Savanna Sanders; Robert & Tracey Brown; Josh Baker; Lee Blue; Russell Brown; Margaret Carroll; Kevin Cormier; James & Melissa Davis; Maria Gallegos & Christopher Ferguson; Angela Hughes; Robert Laird; Harold Ledoux; Kacey Sandefur; Tifani Staner; Stephen Stelly; Randall & Patti Stout; Chris Day; Calvin Hill; Michael & Julie Weisse; Eleanor Leonard; Ivy Hamm Claude Roberts; Bryan Olson; Caren Nueman; Floyd Cline, Jr.; Kenneth Coleman; Haylea Barrow; Carol Roberts; Jenica Vidrine; Charles Collier; Sharon Crissey; James Brad Crone; Heather & James Coggin; Clovis Melancon; Leroy Speights; Crossroads Asphalt Preservation, Inc.; Fesi Energy, LLC; Brian Fischer; and Curtis Laird; Devon Boudreaux; Richard Belsey; Sharon Clubb; Janet Dancer; Porter May; Cindy Perez; Cecile Jimenez; Scott Hamric; Bruce & Tina Hinds; William Olivier; Esteban Lopez; Billy Stanley; Candace Abshier; Sean Fillyaw; Autumn Minton; Brandon Sanders; Rodney Badon; Charlie Carter; Myra Wellons; Jerry Stepan; Bryan Mills; Cat 5 Resources LLC; Jeffrey; Randy & Monica Brazil; Herbert & Kerry Dillard; Southeast Texas Olive, LLC; and Gulf Coast Olive Investments, LLC. Each of the Individual Plaintiffs, like each of the Class Plaintiffs (collectively, "Plaintiffs"), owned and/or leased real and personal property located north of IH-10, and each alleges their property was taken, destroyed, and/or damaged by the State by its design, construction, operation, and/or maintenance of IH-10.

12.     Defendant, the State of Texas, is a sovereign entity and body politic with the power of eminent domain. Defendant, the State answers for its agencies, including but not limited to TxDOT. The State is a governmental entity and through its officials, employees, agents, and contractors performed the work on IH-10 which Plaintiffs claim caused the taking, damage, and destruction of their real and personal property; work which was done by the State for public use and/or purpose.

## FACTS COMMON TO ALL CLAIMS

13.     In 1956, President Dwight D. Eisenhower signed the Federal-Aid Highway Act into law, allocating billions of dollars for the construction of the Interstate Highway System (the "Highway

System"), which, in present day, includes IH-10. The Federal Highway Administration dispenses funds to state governments which, in turn, build and maintain the Highway System within their respective boundaries. The states must follow federal regulations that govern the building and maintenance of the Highway System—including any impact of a particular project's design and operation on the hydrology (rainfall runoff characteristics) of the surrounding property.

14.     As various plan sets show, during the design and construction of Federal Aid Projects, TxDOT significantly raised the elevation of IH-10 and installed a new precast concrete barrier in the median between the east/west-bound lanes of IH-10. The barrier was installed in grouted sections so as to form a complete seal, which rises multiple feet above the now-elevated grade level of the highway.






15.     The miles of uninterrupted median barrier along IH-10 without slots at the base prevent the passage of water between the north and south sides.



16.     The functional effect of installing the solid median barrier on an elevated IH-10 is to create a weir that blocks stormwater runoff on the north side of the highway centerline. The weir backs up and stores water on private property located north of the highway.

17.     The State's design, construction, and maintenance of these barriers/dams was no mistake. Rather, the State has admitted that the barriers/dams—in addition to maintaining traffic

safety—are part of its flood control efforts and keep the southern portion (eastbound lanes) of IH-10 open during severe rainfall events that would otherwise overtop the roadway and inhibit traffic from using that portion of the roadway as an evacuation route.

18.     Indeed, the State was told <u>before</u> it undertook its work on IH-10 of concerns that the proposed highway improvements would cause flooding upstream of the highway. Not only did the State ignore the drainage and flooding concerns of local residents, but it also altered proposed drainage plans prepared by its own contractors and agents to decrease drainage capacity that would pass under the highway in favor of retaining and storing the water north of IH-10, knowingly and intentionally choosing to inundate Plaintiffs' properties to protect properties south of IH-10 from flooding.

19.     Indeed, even after the State's design, construction, maintenance, and operation of the highway and its median barrier caused the flooding of—and significant damage to—Plaintiffs' real and personal property, the State continued to erect the impermeable traffic barrier/dam, extending the barrier further east down the center of the highway despite knowing the damage it would cause to Plaintiffs' properties by the rainfall runoff it blocks.

20.     The State (a) knew that its actions would cause or were causing damage to Plaintiffs' properties; (b) knew that the damage to Plaintiffs' properties was substantially certain to result from its actions; (c) knew that the damage to Plaintiffs' properties was necessarily an incident to, or necessarily a consequential result of, its actions; and/or (d) knew or should have known that the inundation of Plaintiffs' properties was the natural, probable, and foreseeable consequence of its acts.

21.     While the public generally benefits from the access to transportation along at least a portion of this roadway during such rainfall events, the burden of that benefit falls on Plaintiffs, each of which are forced to store the retained waters on their property without their consent or compensation.

22.      For example, in August 2017, Tropical Storm Harvey brought its rainfall to much of southeast Texas. During and after Harvey, the IH-10 median barrier functioned as a leak-proof dam, preventing rainfall runoff from overtopping the roadway and proceeding south in its ordinary course and instead backing water up onto private property to the north of the highway.

23.      While performing its public uses of providing a safety barrier separating the traffic flow, keeping the eastbound traffic lanes open, and retaining stormwater runoff to protect property south of the highway, the storm water runoff detained by the IH-10 median barrier backed up onto and flooded Plaintiffs' private property, causing significant damage to Plaintiffs' properties and severe loss of property rights.



24.      Likewise, in September 2019, TxDOT's median barrier/dam along IH-10 blocked rainfall runoff from overtopping the roadway during and after Tropical Storm Imelda. During Imelda eastbound traffic lanes remained open and conferred a benefit to the public at large—and specifically

protected the property located south of the highway—by blocking storm water runoff and flooding Plaintiffs' property, again causing significant damage and severe loss of property rights.



25.     The damage and destruction of Plaintiffs' real and personal property was the intended, direct, natural, and/or foreseeable result of State-authorized affirmative actions, done for a public use and/or purpose.

26.     Harvey and/or Imelda were not "rare" or "unprecedented" rain events for this region of southeast Texas. The history of hurricanes, tropical storms, and other large storms that have released significant amounts of rainfall in the area is well documented. The permanent placement of an impenetrable traffic median barrier/dam down the center of IH-10 changed the natural watercourses and guarantees that the flooding of Plaintiffs' properties will inevitably reoccur, as when Imelda followed Harvey only two years later. Moreover, detained water from storms less severe than Harvey and Imelda will be held on Plaintiffs' property because of the State's design, construction, and maintenance of the median barrier/dam down the center of IH-10.

27.     Each Plaintiff owned homes, fixtures, businesses, and/or personal property protected from the taking, damaging, or destruction by the State without compensation. The flooding suffered by each Plaintiff interfered with the ability to use their land and personal property for their intended purposes. Plaintiffs had reasonable expectations that they would be able to occupy and use their homes, businesses, and personal property for the purposes and in the manner for which they were purchased or leased. But the backwater stored onto each Plaintiff's property severely interfered with their reasonable investment-backed expectations regarding the occupancy and use of their property. Many Plaintiffs were displaced from their homes and had to stay in hotels or alternative accommodations following Harvey and Imelda due to this government-induced flooding.

28.     Portions of Plaintiffs' homes, businesses, and/or other improvements have been damaged and/or destroyed, necessitating remedial measures such as tearing out of soiled walls, removing mold-prone insulation, replacing ruined floors, replacing garage doors and other exterior features, and requiring the repair of a vast array of structural components. Moreover, many Plaintiffs' properties suffered significant erosion and loss of crops, grasses, and groundcover essential to the use to which Plaintiffs had put the properties. And those Plaintiffs using their property for commercial purposes were deprived of the use of, and temporarily any access to, their property, losing the benefits and profits attendant to the continued operation of their commercial ventures. Each and every one of these impacts were not only severe but also reasonably foreseeable to the State because of the design, construction, and maintenance of IH-10's median barrier.

29.     The impoundment of rainwater runoff on Plaintiffs' property for days on end, destroying Plaintiffs' real and personal property and denying them access to that property, is not something Plaintiffs expected or reasonably could have expected when purchasing and developing their property. Many of these tracts have been owned by Plaintiffs' forebearers and family members for decades. And, before the State's design, construction, and maintenance of the IH-10 median

**FIRST AMENDED MASTER COMPLAINT**                                                **PAGE 11**

barrier, Plaintiffs' properties had never been subject to flooding of the nature, character, extent, and duration as they experienced after TxDOT built the barriers/dams along the elevated IH-10.

30.     And Plaintiffs' problems are not all in the past. Neither Harvey nor Imelda was a "one off" or "unique" flood event for what these Plaintiffs face since the State's erection of the barrier, and they will not be the last flooding Plaintiffs experience because of the State's actions. During foreseeable and anticipated storm events (even those of a lesser magnitude than Harvey and Imelda), IH-10 will continue to capture and store rainfall runoff onto Plaintiffs' properties.

31.     Plaintiffs have already suffered the permanent damage and destruction of real property due to flooding, which necessitated repairs such as tearing out soiled walls, removing mold-prone insulation, replacing ruined floors, replacing garage doors and other exterior features, and requiring the repair of other structural issues.

32.     In addition to the physical damage to real property, Plaintiffs' real property values, including the market value of homes, businesses, and/or other improvements, have suffered a severe diminution in value.

33.     And Plaintiffs suffered the permanent damage, destruction, and loss of personal property including appliances, furniture, tools, machinery, livestock, crops, vehicles, air conditioning units, and similar personal property in addition to the tragic loss of hereditary items and mementoes which can never be replaced.

34.     The State does not possess any legal right to store rainfall runoff on Plaintiffs' private property. The State has never made an offer to Plaintiffs to purchase an easement or other property interest for the storage of floodwaters. The State has never attempted to use its power of eminent domain to acquire an easement or other property interest from Plaintiffs for the purpose of storing rainfall runoff. The State has never compensated or offered to compensate Plaintiffs to use their property to store water.

35.    The following summarizes the foundation of claims presented by Individual Plaintiffs on their own behalf as well as on behalf of Class Plaintiffs, who are similarly situated:

a.    each of the Individual Plaintiffs owned and/or leased real and personal property located north of IH-10 in Chambers, Liberty or Jefferson County, Texas;

b.    each of the Individual Plaintiffs owned and/or leased the above-referenced property at the time the property suffered devastating flooding during Tropical Storms Harvey (August 2017) and/or Imelda (September 2019);

c.    each of the Individual Plaintiffs' real and personal property was inundated, destroyed, and/or damaged as a result of the affirmative actions of the State in designing, constructing, operating, and/or maintaining IH-10;

d.    each of the Individual Plaintiffs' property was damaged by actions of the State which the State either (a) knew would be caused by its actions; (b) knew was substantially certain to result from its actions; (c) knew was necessarily an incident to, or necessarily a consequential result of, its actions; and/or (d) knew or should have known was the natural, probable, and foreseeable consequence of its actions; and

e.    each of the Individual Plaintiffs, as a consequence of the foregoing, is entitled to a recovery of just compensation for the losses suffered by the taking, damaging, and/or destruction of their real and personal property.

**CLASS ALLEGATIONS**

36.    In addition to asserting claims on their own behalf, Individual Plaintiffs bring this matter as a class action. Individual Plaintiffs seek to represent the following Class with regard to a determination of the liability of the State for the claims asserted herein:

Persons (whether individuals, entities, or others) that leased and/or owned real and/or personal property located north of Interstate Highway 10 in Chambers, Liberty, and/or Jefferson County, Texas, which was flooded during Tropical Storms Harvey and/or Imelda by stormwater runoff retained by the State's design, construction,

operation, and maintenance of Interstate Highway 10. Excluded from the Class are the State and Federal Governments, the Court, and Court personnel.

As noted, while the definition of any Class (or subclasses) certified will be set by the Court, based on their current analysis Plaintiffs believe the definition above encompasses the following area:



37.     In any event, the Class is so large that joinder of all members is impracticable. Public records confirm that the putative Class comprises hundreds of properties and includes at least 1,000 members.

38.     There are questions of law or fact common to the determination of liability on behalf of the Class which are capable of class-wide resolution, and the claims or defenses of Individual Plaintiffs with regard to the determination of the State's liability are typical of the claims or defenses concerning the liability of the State to each member of the Class.

a.   Questions of fact common to all putative Class members regarding a determination of liability include those underlying the design, construction, operation, and maintenance of IH-10 (actions undertaken and performed by the State and its agents which apply with uniform effect to each member of the putative Class); whether the intended detention of storm water runoff on the Class' private property during Harvey and/or Imelda was severe enough to constitute a compensable taking under the Texas and/or the U.S. Constitution; what was the hydrologic and hydraulic effect of raising the profile of and installing the concrete barrier on IH-10; what is the size of the reservoir pool created by the State's highway design and construction; and the actions by the State in planning for potential rainfall events and the drainage facilities and capacity needed to avoid inundating private property.

b.   Question of law common to all putative Class members related to the liability of the State include the State's immunity from liability for state and federal takings claims seeking monetary damages or declaratory relief from a federal court; whether Plaintiffs' federal takings claims must be brought pursuant to 42 U.S.C. § 1983 or whether such claims are self-effecting under the Fifth Amendment to the U.S. Constitution and could be filed in federal court pursuant to 28 U.S.C. § 1331; whether the State can obtain dismissal of Plaintiffs' claims through pleadings or defenses in this Court which it could not have raised in the Texas state court where these consolidated actions were originally filed; and whether the State has erected or imposed barriers to the prosecution of an inverse condemnation claim in its own courts that violate the procedural and/or substantive due process protections accorded private property rights under the Fourteenth Amendment to the U.S. Constitution.

---

**FIRST AMENDED MASTER COMPLAINT**                                                    **PAGE 15**

c. These questions of law and fact concerning the liability of the State for the claims brought by Plaintiffs are common to all members of the putative Class, and they predominate over any questions affecting the liability inquiry concerning any individual members of the Class.

39. Individual Plaintiffs' claims are typical of the claims of Class Plaintiffs. Individual Plaintiffs and Class Plaintiffs were inundated by water intentionally stored by the State on and over their real and personal property in August/September 2017 and September 2019 in the same manner, by the same mechanism, and following the same set of factual events and actions. The relief Individual Plaintiffs seek is typical of the relief requested by Class Plaintiffs. And the issues to be joined at trial for Individual Plaintiffs concerning the liability of the State, both factually and legally, are the same as those that would be joined for Class Plaintiffs.

40. Individual Plaintiffs, as representatives of the Class, will fairly and adequately protect the interests of the Class and Class Plaintiffs. Individual Plaintiffs' interests are consistent with, and not antagonistic to, those of the Class they seek to represent and Class Plaintiffs. Individual Plaintiffs and Class Plaintiffs all seek just compensation under the Texas Constitution and the U.S. Constitution. Individual Plaintiffs are ready and able to fairly and adequately protect the interests of the Class and strongly believe the State must provide just compensation for taking private property which flooded during Harvey and Imelda which was caused by the State's actions. Plaintiffs are represented by experienced, qualified, and competent counsel who are committed to prosecuting this action. Counsel is knowledgeable about, and experienced in, conducting class action litigation, complex multi-plaintiff litigation, takings litigation, and flooding litigation. Counsel has and will continue to devote the appropriate resources necessary to prosecute these claims.

41. The elements of Rule 23(b)(1) are met since the prosecution of separate actions by or against individual members of the Class could create a risk of inconsistent or varying adjudications

with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class. Individualized litigation would present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.

42.     The elements of Rule 23(b)(2) are met since the State has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory or injunctive relief regarding the State's liability with respect to the Class as a whole.

43.     The elements of Rule 23(b)(3) are met since maintaining a class action with regard to the issue of the State's liability to Class Members would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Certification is not sought on the question of damages due the Class, or any group of Individual Plaintiffs or Class members. Absent Class treatment, courts would be flooded by takings claims from hundreds of litigants. Class-wide determination of the State's liability will avoid duplication and enable faster processing of the multitude of claims since questions of law or fact common to Class Members as to the State's liability predominate over any questions concerning liability which affect only individual member. Moreover, prosecution of the liability question as a class action is superior to other available methods for fairly and efficiently adjudicating a multitude of individual claims.

## CAUSES OF ACTION

44.     While the standards and controlling authority governing claims under the Texas Constitution and the U.S. Constitution differ, the facts in this case mandate that the State compensate both Individual Plaintiffs and Class Plaintiffs under either provision. In addition, Plaintiffs seek declaratory and injunctive relief regarding the State's failure to institute condemnation actions for the permanent flowage easement it has taken from them. Finally, in the alternative, Plaintiffs plead claims

under the procedural and substantive due process guarantees of the Fourteenth Amendment to the U.S. Constitution should their direct claim for compensation against the State under the Fifth Amendment (through the Fourteenth) and/or Article I Section 17 of the Texas Constitution be found invalid.

**COUNT 1:**    **Violation of Article I, Section 17 of the Texas Constitution for the Taking, Damaging, or Destruction of their Property.**

45.     Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint.

46.     To establish an inverse condemnation claim under Article I, Section 17 of the Texas Constitution, a property owner must show that there has been: (1) an intentional government act by a government entity; (2) that resulted in the taking, damaging, or destroying of a property owner's property; (3) done for public use. Individual Plaintiffs' and Class Plaintiffs' claims fulfill each of these requirements.

**A.     The Design, Construction, Operation, and/or Maintenance of IH-10 was an Intentional Governmental Act by a Governmental Entity.**

47.     The State is a governmental entity.

48.     The design, construction, operation, and maintenance of IH-10 was done by the State through its officials, employees, agents, and/or contractors.

49.     The design, construction, operation, and maintenance of IH-10 by the State intentionally included, *inter alia*, the elevation of the highway's grade line and the installation of a concrete traffic barrier in the median of the highway.

**B.     The Design, Construction, Operation, and/or Maintenance of IH-10 Constitutes Public Use.**

50.     The intrastate and interstate travel promoted by the State's design, construction, operation, and maintenance of IH-10 is a public use.

C.    **The State's Actions Demonstrate the Requisite Intention for Plaintiffs' Inverse Condemnation Claims.**

51.    As to Individual Plaintiffs' and Class Plaintiff's claims under Article I, Section 17 of the Texas Constitution, the element of intent is shown where the governmental entity that physically damages private property to confer a public benefit (1) knows that a specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized government action—that is, that the damage is necessarily an incident to, or necessarily a consequential result of, the government's action. Both of those standards are met here.

1.    **The State had actual knowledge that its actions would cause damage to Individual Plaintiffs' and Class Plaintiffs' properties.**

52.    The State was aware at the time it designed, constructed, operated, and/or maintained the IH-10 projects that its actions would cause physical damage to Individual Plaintiffs' and Class Plaintiffs' private property.

53.    Prior to August 2017, some of Individual Plaintiffs' and Class Plaintiffs' properties suffered short-lived, intermittent flooding from heavy rainfall events, but the storm's runoff was able to (and did) naturally flow over IH-10, ultimately to the Gulf of Mexico. During Tropical Storm Harvey, however, Plaintiffs experienced significantly greater flooding of (and damage to) their properties, and the inundation lasted for a greater period of time—well after Harvey had moved on—than ever before because the rainfall runoff was retained behind the elevated and improved IH-10. This effect and the inundation of Plaintiffs' properties upstream of the highway was the known and intended result of the State's design, Construction, operation, and maintenance of IH-10. The State intentionally used Plaintiffs' properties north of the highway as a detention reservoir for excess storm water that it knew would not be accommodated by the drainage facilities of the highway.

54.    Indeed, during the design and prior to the construction of the highway, affected citizens told State officials (including officials at TxDOT) of the foreseeable drainage problems and

damage that would be caused to their properties by the State's actions. After their predictions came true during the Harvey storm, individuals complained to the State again about the flooding caused by the State's design and construction of Interstate Highway 10, but the State did nothing to alleviate the problem. Indeed, the State underlined continued its ongoing modifications to IH-10, extending even further the impenetrable barrier down the center of the highway despite having been told of the damage caused by the inundation of properties by the rainfall runoff it retained. It was only a matter of time before the State's action submerged Plaintiffs' properties again.

55.     And that time soon came. In September 2019, Tropical Storm Imelda hit southeast Texas and again the State's traffic barrier arrested the rainfall runoff. Even though the State had been previously told of the damage caused during Harvey by the weir it had erected in the middle of IH-10, the State continued its operation and maintenance of the highway and persisted with the erection of the impermeable barrier as well—in fact, the barrier installed in the later phases of its highway "improvements" is even taller that that erected in the initial phases.

56.     Indeed, as Imelda approached one Chambers County resident—Steven Devillier— sought to prevent a repeat of the devastation wreaked by Harvey. Devillier asked government officials for permission to remove some of the barrier, but when his request was relayed to TxDOT, it was denied. The Beaumont Enterprise related the story:

> "[Steven] Devillier lives near Winnie in Chambers County, on the north side of Interstate 10. When Hurricane Harvey struck the region in 2017, a solid concrete barrier that divides the freeway's eastbound and westbound lanes had acted like a dam, holding back water headed toward the Gulf of Mexico.
>
> …
>
> Since Harvey, Devillier says, he had been trying to get something done about the freeway partition. Could the divider be redesigned to allow water to flow through? Could drainage underneath be improved?
>
> The barrier seemed to hold back water to the north, swamping the freeway lanes headed toward Houston. The build-up, he believes, caused his and other homes to be inundated, family members included. The freeway was closed for three days.

Devillier says he and his cousin petitioned authorities for change that didn't come fast enough.

As Imelda bore down, Devillier begged the Chambers County judge for permission to demolish the barrier with a track hoe, he said. The county engineer said officials passed the request to the Texas Department of Transportation, believing it was not the county's decision to make.

TxDOT, according to a spokesperson, had been working with University of Texas researchers to study how the barrier affected flood-prone areas. The agency wasn't ready to see the barricade immediately taken down.

The barrier kept the eastbound lanes of the freeway open, spokesperson Sarah Dupre wrote in an email, allowing authorities to reach an otherwise sealed-off Winnie.

57.     Thereafter, thousands of acres north of the IH-10 barrier was <u>again</u> flooded by rainfall runoff retained by the State's projects.

58.     Because of the benefits to the general public, including the enhanced safety and the creation of an evacuation route via the eastbound lanes of the freeway, the State chose to design, construct, operate, and maintain the operation of IH-10 in a manner that it knew would flood Plaintiffs' properties. That intentional choice by the State has forced Plaintiffs to bear the burden of providing the public benefits sought by the State, and Plaintiffs are constitutionally entitled to compensation for their losses.

**2. The State possessed knowledge that damage to Plaintiffs' properties was substantially certain to result from its actions.**

59.     The State actions that form the basis of Plaintiffs' claims were public works performed pursuant to Federal Aid Projects. Compliance with the federal and state rules and regulations applicable to that work was mandatory. The analyses, studies, and documentation required by those rules and regulations provide objective evidence that the State knew harm to Plaintiffs' properties was substantially certain to result from its actions.

60.     Compliance with federal regulations, specifically 23 C.F.R. Part 650, Subpart A is required when a proposed project includes a new or expanded encroachment on a floodplain regulated by FEMA.

61.     FEMA's Flood Insurance Rate Map ("FIRM") panels show that a portion of the State's projects cross FEMA Special Flood Hazard Areas.

62.     Traffic median barriers the State added to IH-10 constitute floodplain encroachments under the terms of the National Flood Insurance Program.

63.     23 C.F.R. Part 650, Subpart A required TxDOT to prepare location hydraulic studies for each of the projects that would include a discussion of (a) the hydraulic risks associated with implementation of the action, (b) the impacts from the action on natural and beneficial floodplain values, (c) the support of probable incompatible floodplain development, (d) the measures to minimize floodplain impacts associated with the action, and (e) the measures to restore and preserve the natural and beneficial floodplain values impacted by the action, along with an evaluation and discussion of the practicability of alternatives to any longitudinal encroachments. TxDOT's understanding of and need for compliance with these regulations created objective evidence of the State's knowledge of the damage to Individual Plaintiffs' and Class Plaintiffs' properties that would occur from its actions.

64.     Similarly, compliance with Presidential Executive Order 11988 was required for the State's work on Interstate Highway 10.

65.     Presidential Executive Order 11988 requires each actor, in carrying out federal programs, (1) to reduce the risk of flood loss, to minimize the impact of floods on human safety, health and welfare, and to restore and preserve the natural and beneficial values served by floodplains; and (2) to evaluate the potential effects of any actions in a floodplain to ensure its planning programs reflect consideration of flood hazards and floodplain management and to consider alternatives that will not impact a floodplain. Additional federal regulations required the State to implement its Federal Aid Projects in a manner (a) to prevent uneconomic, hazardous, or incompatible use and development of floodplains; (b) to avoid, where practicable, encroachments by its actions; (c) to minimize the

adverse impacts its actions may have on base floodplains, including direct or indirect support for development; and (d) to preserve the natural and beneficial floodplain values that may be adversely affected.

66.     Finally, Texas state statutes and regulations, including TxDOT's own rules and policies, require an investigation, analysis, and documentation that provide objective evidence of the State's knowledge of the expected flooding of Plaintiffs' properties created by the State's actions. The standards and criteria presented in the TxDOT Hydraulic Design Manual are the minimum standards and criteria acceptable for projects involving new drainage structures or replacement of existing structures (as TxDOT's work on IH-10 did). All drainage facilities were required to have been designed for existing land use conditions and should have included capacity to convey stormwater runoff from all existing adjacent properties for the design year storm so that the projects would not induce flooding or cause any adverse flooding impact on upstream facilities.

67.     To that end, during the projects' design work the State is required to study the natural and established patterns of drainage—including that beyond the vicinity of each proposed project—to minimize or avoid damage to adjacent property.

68.     The State is required to investigate the established patterns of drainage so that the project's drainage design would include capacity to convey stormwater runoff from <u>all</u> existing adjacent properties based on existing land use conditions at the time of the design. Hydrologic analyses were necessary for each project, and <u>all</u> sources of potential risk must have been considered as part of the investigation for the projects' hydraulic structures—including the consequences associated with the probability of flooding, property loss, and/or hazard to life during the service life of the project—to determine whether modified site-specific standards or criteria would be appropriate for the project.

69.     At the time of design, all drainage facilities must be designed for existing land use conditions and so that any project does not cause an adverse flooding impact on facilities existing

upstream of the project. TxDOT hydraulic engineers must review the potential liabilities stemming from the impact of any highway project on a floodplain. This includes instances where, as here, the rehabilitation or maintenance of a roadway results in a higher profile, such as the case presented here. TxDOT engineers must evaluate the impact of its work to ensure consistency with the federal requirements regarding the impact of a highway on a floodplain.

70.     In the course of its work, the State is required to study the antecedent conditions and basic hydrologic data surrounding the project and determine and prepare an event-based model for the project's design flood. Likewise, the state is required to determine the direct runoff, the peak stage, the peak flow, the flood peak, the effective precipitation, the annual exceedance probability, the overland flow, the direct excess, the surface runoff, and the design runoff for the design flood as well as for the design storm.

71.     Because of this hydrologic investigation, TxDOT determined the elevations that make up the flood profile and knew that the traffic median barrier would retain direct runoff. The State knew that stormwater runoff flowed from north to south when it raised the grade level of IH-10 and installed a dam down its centerline. The State also knew that the concrete traffic barrier installed by the State would reach a height greater than twelve inches (12") above the base flood elevation north of the highway.

72.     Indeed, after Harvey (and prior to Imelda), TxDOT employees were told that the traffic median barrier previously installed in the center of IH-10 had resulted in the flooding of private property. The State had actual knowledge of the flooding its latest project would cause before it raised the grade level of IH-10 and installed a dam down its centerline prior to Imelda.

**3. In the alternative, subjective knowledge by the State that its action will cause specific harm to a specific piece of property should not be required to recover on a Takings claim under the Texas Constitution.**

73.     Texas courts have held that the similarity of the federal and state takings provisions permit application of federal jurisprudence as a guide to the standard for determination of claims brough under Article I, Section 17 of the Texas Constitution.

74.     However, as shown below in Count 2, the intent or knowledge requirement to demonstrate a taking under the Texas Constitution arguably differs from the showing required to recover under the Fifth Amendment to the U.S. Constitution. Given the recent change in takings jurisprudence by the U.S. Supreme Court, any difference between the intent/knowledge standards should be eliminated. The rights and protection accorded Texas property owners under the State constitution's takings provision should not provide less security against having their property taken without just compensation than its federal counterpart. The ability of a property owner to litigate both a Fifth Amendment takings claim and a claim under Article I, Section 17 of the Texas Constitution in the same suit should bring the intent standard applicable to each in harmony to eliminate an unnecessary and perfidious dichotomy between the state and federal claims.

75.     Government actors should be treated the same as other litigants vis-à-vis how the element of "intent" is applied under Texas law when that element is adjudicated in an action to which they only are subject—a takings claim. A finding of reckless (or willful) disregard of facts by the State should support a determination of the requisite intent for an inverse condemnation claim under the Texas Constitution.

76.     Therefore, as an alternative, Plaintiffs bring their nonfrivolous argument for the extension, modification, or reversal of existing Texas law, and seek recovery of just and adequate compensation pursuant to Article I, Section 17 of the Texas Constitution for the permanent and/or temporary taking, damaging, and/or destruction of their real and personal property with a finding that

the State knew or should have known the consequences of its actions absent its reckless (or willful) disregard of facts.

**COUNT 2:** **The Taking of Property Without Just Compensation in Violation of the Fifth Amendment to the United States Constitution.**

77.     Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint.

78.     In addition to, and in the alternative to, their claim under the Texas Constitution, Plaintiffs seek recovery for the State's permanent and/or temporary taking of their real and personal property without paying just compensation in violation of the Takings Clause of the Fifth Amendment of the U.S. Constitution, a self-executing constitutional provision applicable to the State through the Fourteenth Amendment of the U.S. Constitution.

79.     Federal takings jurisprudence directs that whether government-induced increased water runoff onto private property constitutes inverse condemnation under the Fifth Amendment is determined by a two-question test: (1) did the plaintiff possess a protectable property interest in what they allege the government has taken and (2) were the effects the plaintiff experienced the predictable result of governmental action which was sufficiently substantial to justify a takings remedy.

80.     In addition, the second question—whether the effects the plaintiff experienced was the predictable result of governmental action which was sufficiently substantial to justify a takings remedy—is assessed through the conceptual framework applicable to the type of claim asserted. The government can take property by two means: physically or by regulation. Furthermore, a taking can be either permanent or temporary in duration. And takings can be further divided into two categories: categorical and non-categorical. Categorical takings deprive the owners of all economically viable use of their property while Non-categorical takings (such as easements) deprive the owner of some amount of the economic use of the property. The State-caused flooding imposed on Plaintiffs effected (1) a temporary categorical physical taking of their real property; (2) a permanent non-categorical

physical taking of a flowage easement over their real property, and (3) a permanent categorical physical taking of their personal property.

### A.   All Plaintiffs Possess a Protectable Interest in Their Property.

81.      The existence of a protectable property interest under the Fifth Amendment is determined by reference to state law. Texas law recognizes that the term property means not only the thing owned, but also every right which accompanies ownership. Each Plaintiff had property rights in both real and personal property protected by the Fifth Amendment that were taken by the State's actions.

### B.   The State's Physical Invasion of Plaintiffs' Property, Depriving Them of the Use, Enjoyment, Exclusive Possession, and Right to Alienate their Property, Constitutes a Taking Under the Fifth Amendment.

82.      Plaintiffs' properties were physically invaded by stormwater runoff the State stored on their land, in their homes, and/or in their businesses. The inundation itself lasted for a several days, and that was followed by a long period of cleanup, replacement, and repair after both Harvey and Imelda. Indeed, some properties were not completely repaired after Harvey when Imelda struck, and some remain unfinished to this day. The physical inundation of the real and personal property owned and/or leased by Plaintiffs was greater than ever before and caused by the State's design, construction, operation, and maintenance of IH-10—a public use. The physical possession of Plaintiffs' property, both real and personal, constitutes a *per se* taking of that property by the State under the Fifth Amendment to the U.S. Constitution, as made applicable to the State by the Fourteenth Amendment and the convention of adoption upon entry of the State into the Union.

### C.   The Effects Plaintiff Experienced Were the Predictable Result of the State's Action and Were Sufficiently Substantial to Justify a Takings Remedy.

83.      Independently, an analysis of factors examined under federal takings jurisprudence demonstrates that not only was the flooding Plaintiffs experienced the predictable result of the State's action, but also the effects suffered were sufficiently severe to constitute a taking.

---

### 1.   The time and duration of the invasion.

84.     Because Plaintiffs' properties were physically invaded by the flooding from the State's actions (whether temporarily or permanently), the temporal element of the federal analysis is used only to determine the measure of just compensation under the Fifth Amendment, not whether a claim arose at all. This element supports the finding of a taking.

### 2.   The severity of the interference.

85.     Plaintiffs meet the severity burden since their real and personal property interests have been subjected to an invasion that significantly diminished, destroyed, and/or completely precluded Individual Plaintiffs' and Class Plaintiffs' access to, right to use, and enjoyment of that property. This element supports the finding of a taking.

### 3.   Plaintiffs' properties were flooded by the State's actions.

86.     The question presented by the third factor is whether the invasion of Individual Plaintiffs' and Class Plaintiffs' properties was caused by the State's action. In essence, a comparison of the results from government-authorized actions for a public purpose with what the result would have been without or "but for" those government-authorized actions. Plaintiffs' properties are located behind a permanent structure that blocks and backs up rainfall runoff at a level that floods those properties. The inundation of Plaintiffs' properties was the direct, natural, and foreseeable result of authorized activities by the State in furtherance of a public purpose: the design, construction, operation, and maintenance of IH-10. "But for" the State-authorized action, Plaintiffs' properties would not have been flooded in the manner and to the extent they were flooded. This factor supports the finding of a taking.

### 4.   The degree to which the invasion was intended.

87.     The intent to find a taking under the Fifth Amendment is shown by evidence that Plaintiffs' injuries were the direct, natural, or probable result of the authorized government action. It

is not necessary to show that the State subjectively intended to take specific parcel or item of property owned by any specific Plaintiff, only that the flooding of Plaintiffs' land was the natural and probable consequence of the State's acts. Before the State's actions, rainfall runoff overtopped IH-10 and proceeded south to the Gulf. But, after the State raised the highway elevation and built a solid barrier/dam through the roadway median, those structures retained stormwater runoff on Plaintiffs' property. Because an analysis by the State of the hydrological impact caused by its design, construction, operation, and maintenance of IH-10 would have confirmed that Plaintiffs' property would be flooded thereby, this factor supports the finding of a taking.

### 5. The character of the land at issue.

88.      Plaintiffs' properties are homes, farms, ranches, and businesses whose use is grossly inconsistent with—and exceptionally vulnerable to—significant damage from flooding of the kind and severity experienced because of TxDOT's IH-10 projects. The character of the land, as reflected in its use by Plaintiffs, supports the finding of a taking.

### 6. Individual Plaintiffs' and Class Plaintiffs' reasonable investment-backed expectations.

89.      Finally, the State's actions ran counter to, and severely interfered with, Plaintiffs' reasonable investment-backed expectations in the safety and security of the residential and commercial properties that they rented or owned, as well as the use and enjoyment of their personal property destroyed by the subject flooding.

90.      When Individual Plaintiffs and Class Plaintiffs acquired their property interests, they did so in light of the then-existing flood risk and drainage profiles. But the State created a new hydrologic landscape and implemented a *de facto* flood control effort that did not exist, or was not evident, when Plaintiffs purchased or leased their private property. Most of Individual Plaintiffs' and Class Plaintiffs have invested their life savings into their properties without any expectation of the flood certainty that the State has created. The State-created flooding has severely impacted the

economically viable and productive use of the land, decimating Plaintiffs' reasonable investment-backed expectations. This factor too supports the finding of a taking.

**COUNT 3:**     **Deprivation of Property Interests Without Procedural Due Process in Violation of the Fourteenth Amendment to the United States Constitution.**

91.     Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint.

92.     In the alternative to Count 1, to the extent that any Plaintiffs' inverse condemnation claim under Court 1 of this Master Complaint be denied based on a determination that it must be shown that the State possessed actual knowledge that its actions were certain to inundate specific parcels of property owned by that Plaintiff, Plaintiffs assert application of that standard of intent to their inverse condemnation claim under Article I, Section 17 of the Texas Constitution violates the rights, privileges, and/or immunities secured by the Fourteenth Amendment to the U.S. Constitution by depriving Plaintiffs of a property interest without procedural due process of law.

93.     Plaintiffs claim an unconstitutional violation of their rights to procedural due process under the Fourteenth Amendment to the U.S. Constitution (a) from the failure of the State to institute a pre-deprivation process or procedure under the Texas Property Code when taking a permanent flowage easement over their property, and (b) from the State's creation and assertion of an intent requirement for their inverse condemnation actions which demands proof of actual knowledge on the part of the State that its action was certain to inundate the specific parcels of property owned by Plaintiffs.

94.     Plaintiffs did not have the opportunity to have their claim for compensation as provided for by the Texas Constitution because the State never undertook the process provided under the Texas Property Code for the condemnation of a permanent flowage easement over their property which would have permitted the State to store stormwater runoff detained by its project. Plaintiffs were thus deprived of the procedural due process rights they should (and would) have been accorded by the conduct of formal condemnation proceedings pursuant to the Texas Property Code.

95.     And Plaintiffs assert that their inverse condemnation claims under Court 1 of this Master Complaint should not be subjected to a determination that the State possessed actual knowledge that its actions were certain to inundate the specific parcels of property owned by Plaintiffs, as such requirement constitutes a denial of procedural due process in the bringing of a claim for inverse condemnation under the Texas Constitution. Such a standard for the intent or knowledge requirement necessary to pursue an inverse condemnation claim under the Texas Constitution differs from the proof required to recover under the Fifth Amendment to the U.S. Constitution and is so onerous, in and of itself, as to constitute a denial of procedural due process under the Fourteenth Amendment to the U.S. Constitution. The rights and protection accorded Texas property owners under the State Constitution's takings provision should <u>not</u> provide less security against having their property taken without just compensation than its federal counterpart (which contains no such requirement).

96.     The ability of a property owner to litigate both a Fifth Amendment Takings claim and a claim under Article I, Section 17 of the Texas Constitution in the same state court action should bring the intent standard applicable to each in harmony so that (a) an unnecessary and perfidious dichotomy between the state and federal claims is eliminated and (b) the long-recognized policies behind the guarantee of compensation embodied by Takings provisions are promoted. The State's reckless disregard, willful ignorance, and/or intentional avoidance of knowledge and facts should support a finding of the requisite intent for a takings claim under Article 1, Section 17 of the Texas Constitution.

97.     In the event a constitutional "floor" for the intent required for an inverse condemnation claim is not set equivalent to that imposed by the Takings Clause of the U.S. Constitution, procedural due process should require that the intent element of an inverse condemnation claim under Article I Section 17 of the Texas Constitution is satisfied by proof showing

reckless disregard, willful ignorance, and/or intentional avoidance of knowledge and facts on the part of the State – as imposed by Texas law on any other civil litigant.

**COUNT 4:** **Deprivation of Property Interests Without Substantive Due Process in Violation of the Fourteenth Amendment to the United States Constitution.**

98.     Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint.

99.     In the alternative, should Plaintiffs' inverse condemnation claims under Court 2 be denied based on a determination that the Plaintiffs have no right to directly assert an inverse condemnation claim against the State of Texas for just compensation under the Fifth Amendment to the U.S. Constitution, Plaintiffs assert that their substantive rights to due process protection secured by the Fourteenth Amendment to the U.S. Constitution have been violated by the State's taking of their real and personal property rights.

100.     The State's exercise of control over, and destruction of, Plaintiffs' property implicates Plaintiffs' constitutionally protected rights in that real and personal property. The State's taking, damaging, and/or destruction of Plaintiffs' property rights support the filing of an inverse condemnation claim by Plaintiffs under the Fifth Amendment to the U.S. Constitution, and the failure of the State to prosecute any action to take those rights is not rationally related to a legitimate governmental interest, especially when weighed against the rights and protection accorded Texas property owners under the Fifth Amendment to the U.S. Constitution (as applicable to the State under the Fourteenth).

101.     The substantive principles applied to inverse condemnation claims under the Fifth Amendment to the U.S. Constitution should serve as the constitutional minimum required of the State of Texas in assessing whether adequate compensation is due Texas property owners when their property is taken, damaged, or destroyed by the State for a public purpose. The failure to permit Plaintiffs to purse an inverse condemnation claim against the State of Texas for just compensation

under the Fifth Amendment to the U.S. Constitution violates the Plaintiffs' substantive rights to due process guaranteed by the Fourteenth Amendment to the U.S. Constitution.

**COUNT 5:**     **Request for Declaratory and Injunctive Relief.**

102.     Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint.

103.     Plaintiffs seek a judgment declaring: (a) that the State of Texas is liable to them for taking, damaging, and/or destroying property rights without adequate compensation as required by Article I, Section 17 of the Texas Constitution, and/or the Fifth and Fourteenth Amendments to the U.S. Constitution, and (b) that the State's actions violated the due process protections guaranteed by the Fourteenth Amendment to the U.S. Constitution.

104.     In support, Plaintiffs plead that they seek relief from uncertainty and insecurity with respect to rights, status, and other legal relations in their real property as against the defendant State in that their rights, status, or other legal relations in their title to property are affected by the State's action. Plaintiffs seek a declaration of the constitutionality of the disputed State actions, including a declaration that Plaintiffs' property rights were their taken, damaged, and/or destroyed without adequate compensation under Article I, Section 17 of the Texas Constitution and/or the Fifth and Fourteenth Amendments to the U.S. Constitution.

105.     Plaintiffs likewise request further and supplemental prospective injunctive relief requiring the State to remedy its taking, damaging, and/or destruction of property rights without adequate compensation by instituting the process set forth in Chapter 21 of the Texas Civil Practice & Remedies Code to formally condemn those property interests previously taken, damaged, and/or destroyed without adequate compensation.

## PRAYER

Plaintiffs pray that the Court enter judgment finding they are entitled to recover based on the allegations above in an amount to be determined by the trier of fact and awarding all other relief this Court is empowered to provide and to which Plaintiffs show themselves entitled.

Dated: May 28, 2021

Respectfully submitted,

*/s/ E. Lawrence Vincent*

Daniel H. Charest
SBN: 24057803
S.D. Tex. ID No.: 934267
E. Lawrence (Larry) Vincent
SBN: 20585590
S.D. Tex. ID No. 10240
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4559
Facsimile: (469) 444-5002
dcharest@burnscharest.com
lvincent@burnscharest.com

Charles Irvine
SBN: 24055716
IRVINE & CONNER, PLLC
4709 Austin Street
Houston, Texas 77004
Telephone: (713) 533-1704
Facsimile: (713) 524-5165
charles@irvineconner.com

Lawrence G. Dunbar
SBN: 06209450
DUNBAR HARDER, PLLC
10590 West Office Drive, Suite 2000
Houston, Texas 77042
Telephone: (713) 782-4646
Facsimile: (713) 782-5544
ldunbar@dunbarharder.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument has been served on May 28, 2021, via ECF to all counsel of record, pursuant to the Federal Rules of Civil Procedure.

/s/ E. Lawrence Vincent
E. Lawrence Vincent