United States District Court
Southern District of Texas

**ENTERED**

July 30, 2021

Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| RICHARD ALLEN DEVILLIER, *et al.*, | § § § | |
| Plaintiffs. | § § | |
| VS. | § § | CIVIL ACTION NO. 3:20-CV-00223 |
| STATE OF TEXAS, | § § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

In May 2020, a group of 45 individuals and one limited liability company (the "Devillier Plaintiffs") who own property on the north side of Interstate Highway 10 ("IH-10") in Chambers County filed a lawsuit in Texas state district court, alleging that their "properties were inundated, taken, destroyed, and/or damaged by the State of Texas by its design, construction, operation, and/or maintenance of IH-10." Dkt. 1-2 at 25. In their lawsuit, the Devillier Plaintiffs sought more than $1 million each for the alleged taking of their property in violation of Article I, Section 17 of the Texas Constitution and the Fifth Amendment of the United States Constitution.

A month after the Devillier Plaintiffs filed their original state court lawsuit, the State of Texas ("the State") removed the case to federal court based on federal question jurisdiction. The State then filed a Motion to Dismiss Plaintiffs' Original Complaint. *See* Dkt. 6. On February 22, 2021, I filed a Memorandum and Recommendation, recommending that the State's motion to dismiss be denied. *See* Dkt. 26. That Memorandum and Recommendation was ultimately adopted as the opinion of the Court. *See* Dkt. 35.

A short time after the Devillier Plaintiffs brought this lawsuit, other property owners represented by the same counsel filed three similar actions in state district court (two in Chambers County; one in Jefferson County), alleging the same claims

based on the same factual allegations. Those cases were removed to federal court, and then eventually transferred to the Galveston Division of the Southern District of Texas. In the interests of judicial economy and efficiency, I consolidated all the actions into this case on May 17, 2021. *See* Dkt. 41. I also granted leave to file an amended pleading.

The live pleading is Plaintiffs' First Amended Master Complaint ("Complaint"). *See* Dkt. 43. The Plaintiffs now consist of 72 individuals, one corporation, and four limited liability companies.[1] The Complaint alleges that the State constructed an impenetrable concrete barrier along a stretch of Texas highway for purposes of storing stormwater on Plaintiffs' private property without their consent or compensation in violation of both the Texas and U.S. Constitutions.

---

[1] The Plaintiffs are Richard & Wendy Devillier; Steven & Rhonda Devillier; David & Angela McBride; Bert Hargraves; Barney & Crystal Threadgill; Barbara Devillier; David Ray; Gary Herman; Rhonda Glanzer; Chris & Darla Barrow; Dennis Dugat; Laurence Barron; Deanette Lemon; Jill White; Beverly Kiker; Yale Devillier, Individually and as Personal Representative of the Estate of Kyle H. Devillier; Charles Monroe; Jacob & Angela Fregia; Jerry & Mary Devillier; Zalphia Hankamer; Larry Bollich; Susan Bollich; Sheila Marino; William Meissner; Taylor McBride; Brian & Kathleen Abshier; Jina Daigle; Coulon Devillier; Halley Ray Sr., Halley Ray Jr. & Sheila Moor; John Rhame; Alex & Tammy Hargraves; William Devillier; Kyle & Allison Wagstaff; Kevin Sonnier; Eugenia Molthen; Bradley Moon; John Roberts; Marilyn Roberts; Savanna Sanders; Robert & Tracey Brown; Josh Baker; Lee Blue; Russell Brown; Margaret Carroll; Kevin Cormier; James & Melissa Davis; Maria Gallegos & Christopher Ferguson; Angela Hughes; Robert Laird; Harold Ledoux; Kacey Sandefur; Tifani Staner; Stephen Stelly; Randall & Patti Stout; Chris Day; Calvin Hill; Michael & Julie Weisse; Eleanor Leonard; Ivy Hamm Claude Roberts; Bryan Olson; Caren Nueman; Floyd Cline, Jr.; Kenneth Coleman; Haylea Barrow; Carol Roberts; Jenica Vidrine; Charles Collier; Sharon Crissey; James Brad Crone; Heather & James Coggin; Clovis Melancon; Leroy Speights; Crossroads Asphalt Preservation, Inc.; Fesi Energy, LLC; Brian Fischer; and Curtis Laird; Devon Boudreaux; Richard Belsey; Sharon Clubb; Janet Dancer; Porter May; Cindy Perez; Cecile Jimenez; Scott Hamric; Bruce & Tina Hinds; William Olivier; Esteban Lopez; Billy Stanley; Candace Abshier; Sean Fillyaw; Autumn Minton; Brandon Sanders; Rodney Badon; Charlie Carter; Myra Wellons; Jerry Stepan; Bryan Mills; Cat 5 Resources LLC; Jeffrey, Randy & Monica Brazil; Herbert & Kerry Dillard; Southeast Texas Olive, LLC; and Gulf Coast Olive Investments, LLC.

The State has filed a motion to dismiss the Complaint. *See* Dkt. 44. The motion is fully briefed and ripe for decision. *See* Dkts. 45 (Plaintiffs' response) and 46 (the State's reply). Having carefully reviewed the motion, the responsive briefing, and the applicable law, I recommend that the motion be **DENIED**.

## BACKGROUND FACTS[2]

In 1956, President Dwight D. Eisenhower signed into law the Federal Aid Highway Act, allocating billions of dollars to the Federal Highway Administration. The funds were to be dispersed to the states in a joint effort to construct and maintain an Interstate Highway System. One-third of IH-10, the fourth-longest Interstate in the system, passes through Texas on its way from Jacksonville, Florida, to Santa Monica, California. It is along this one-third stretch of American ingenuity, east of Houston in Chambers County, that the present dispute between individual property rights and state sovereignty arises.

To facilitate the use of IH-10's eastbound lanes as an evacuation route during periods of flooding, the Texas Department of Transportation recently raised the elevation of IH-10, widened it from four to six lanes, and installed a 32-inch impenetrable, solid concrete traffic barrier on the highway's centerline. The median barrier looks like this:

---

[2] The background facts are taken from the Complaint and are accepted as true for purposes of ruling on the motion to dismiss. *See Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004).



Dkt. 43 at 7. This barrier, abnormal for its elimination of the ordinary ground level drainage slots, effectively created a dam protecting the southside of the freeway from flooding by barricading all rainfall on the northside. Rainfall that would otherwise run overtop the roadway and continue downstream towards the Gulf of Mexico instead stopped at the barrier and caused backwater flooding onto Plaintiffs' properties on the northside of the barrier. That is exactly what happened in August 2017 when Hurricane Harvey dumped 60 inches of rain along the Texas coast. It happened again in September 2019 when Tropical Storm Imelda dropped another 40 inches. Plaintiffs acknowledge that "the public generally benefits from the access to transportation along at least a portion of this roadway during such rainfall events," but maintains that "the burden of that benefit falls on Plaintiffs, each of which are forced to store the retained waters on their property without their consent or compensation." *Id.* at 8. The Complaint provides visual proof of the barrier's impact on the roadway and the surrounding properties.





*Id.* at 9–10.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(c), a defendant may move for a judgment on the pleadings after filing an answer to the complaint. *See* FED. R. CIV. P. 12(c). District courts review motions filed under Rule 12(b)(6) and Rule 12(c) using the same standard. *See Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)

(Rule 12(c) "motions will be treated as a motion for judgment on the pleadings based on a failure to state a claim on which relief may be granted."). A motion for a judgment on the pleadings "should be granted if there is no issue of material fact and if the pleadings show that the moving party is entitled to judgment as a matter of law." *Morgan v. Medtronic, Inc.*, 172 F. Supp. 3d 959, 962 (S.D. Tex. 2016).

Although all facts are viewed in the light most favorable to the plaintiff, those facts must "state a claim to relief that is plausible on its face." *Id.* at 963(quotation omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In drawing that reasonable inference, the court's review must be "limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). As a general rule, "motions to dismiss are viewed with disfavor and are rarely granted." *Sanchez v. County of El Paso*, 486 F. App'x 455, 456 (5th Cir. 2012) (cleaned up).

The Court of Federal Claims recently explained the uphill climb faced by parties seeking to dismiss a takings claim:

> Most takings claims turn on situation-specific factual inquiries. Due to the fact-intensive nature of takings cases, trial courts tend to be slow to dismiss them, and to create a record with detailed findings of fact. More specifically, flooding cases, like other takings cases, should be assessed with reference to the particular circumstances of each case, and not by resorting to blanket exclusionary rules.

*In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 138 Fed. Cl. 658, 664 (2018) ("*In re Upstream I*") (cleaned up).

## ANALYSIS

### A.   PLAINTIFFS' FEDERAL INVERSE CONDEMNATION CLAIM

Plaintiffs couch their federal inverse condemnation claim as arising directly under the Fifth Amendment to the U.S. Constitution. The Fifth Amendment

provides that no "private property [shall] be taken for public use without just compensation." U.S. CONST. amend. V. That prohibition against unlawful government takings has long been understood as applicable to the states by virtue of the Fourteenth Amendment. *See Chicago, B & Q. R. Co. v. Chicago*, 166 U.S. 226, 235–42 (1897).

In its motion to dismiss, the State argues that Plaintiffs' federal inverse condemnation claim should be dismissed for a number of independent reasons. First, the State contends that Plaintiffs' federal takings claim cannot be brought directly under the Fifth Amendment, but rather must be brought under 42 U.S.C. § 1983. According to the State, this dooms Plaintiffs' federal takings claim because § 1983 claims cannot be brought against a state actor. Second, the State argues that Plaintiffs' federal claims are barred by the applicable statute of limitations. Third, the State insists that Plaintiffs have failed to properly plead a valid federal inverse condemnation claim. I address each argument separately.

### 1. Plaintiffs do not need to bring their Fifth Amendment takings claim under § 1983.

To begin, the State contends that Plaintiffs cannot assert a claim directly under the Fifth Amendment's Takings Clause. Instead, the State argues, § 1983 is the only vehicle by which a constitutional violation can be brought. Section 1983 provides a remedy against "[e]very person" who, under color of state law, deprives a citizen of the United States of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. *See also Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). Section 1983 is not an independent source of constitutional or statutory rights; it simply provides a cause of action for governmental violations of rights protected by the Constitution or other federal statutes. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994).

At first blush, it would appear largely irrelevant whether Plaintiffs bring their federal inverse condemnation claim directly under the Fifth Amendment or through § 1983 based on a violation of the Fifth Amendment. It's six of one, half

dozen of another, right? Wrong. In truth, it makes a huge difference because the State is not a "person" within the meaning of § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). That means Plaintiffs cannot sue a state or a state agency for a constitutional violation under § 1983. *See Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 69 (1997) ("We have held . . . that § 1983 actions do not lie against the State."). As applied to this case, the net effect of requiring Plaintiffs to bring their federal constitutional takings claim under § 1983 against the State would be to end the claim before it even began. This is exactly the approach the State champions. It is a classic Catch-22: plaintiffs must bring their federal takings claim against the State under § 1983, but such claims are dead on arrival because plaintiffs cannot bring their federal constitutional claims against the State under § 1983.

I find the State's stance incredibly myopic. Relying on a series of cases that declare, largely without any substantive analysis, that a "[p]laintiff has no cause of action directly under the United States Constitution," the State adopts the position that a litigant complaining of a violation of the Takings Clause "must utilize 42 U.S.C. § 1983." *Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992). *See also Golden Gate Hotel Ass'n v. City & Cnty. of San Francisco*, 18 F.3d 1482, 1486 (9th Cir. 1994) ("[A]ll claims of unjust taking ha[ve] to be brought pursuant to Section 1983."). In considering the State's argument, it is important to think for a moment about the dramatic implications of such a rule. Under the State's view, it can take property from a private citizen without paying just compensation and the private citizen would be left without a remedy. Take an example. Person A owns a 20-acre vacant parcel. While Person A is on a five-year trip around the world, the State commandeers the property, constructs a state office building on the property, and utilizes the building on the property—all without the permission of the property owner. When Person A returns home, the State tears down the building and returns the property to its original vacant state. This is a classic taking for which Person A is clearly entitled to be compensated.

*See Knick v. Township of Scott*, 139 S. Ct. 2162, 2167 (2019) ("A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it."); *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005) ("The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property."). But not so fast. Amazingly, the State maintains that Person A would have no federal constitutional remedy against the State because a Fifth Amendment takings claim can never be brought against a State under § 1983. This thinking eviscerates hundreds of years of Constitutional law in one fell swoop, and flies in the face of commonsense. It is pretzel logic.

There is not, as the State suggests, some sort of "state exception" that excludes state governments from the reach of the Fifth Amendment's Takings Clause. The complete opposite is true. "Historically, the United States Supreme Court has consistently applied the Takings Clause to the states, and in so doing recognized, at least tacitly, the right of a citizen to sue the state under the Takings Clause for just compensation." *Manning v. Mining & Minerals Div. of the Energy, Minerals & Nat. Res. Dep't*, 144 P.3d 87, 90 (N.M. 2006) (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 306–09 (2002); *Palazzolo v. Rhode Island*, 533 U.S. 606, 614–15 (2001); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027–30 (1992)). As already noted, the Fifth Amendment is made applicable to the states via the Fourteenth Amendment. *See Murr v. Wisconsin,* 137 S. Ct. 1933, 1942 (2017).

"As an essential element of individual liberty, the Takings Clause was included in the Bill of Rights to ensure the protection of private property from an overreaching government." *Manning*, 144 P.3d at 89–90. The Fifth Amendment's Takings Clause is self-executing in that it creates a substantive right to just compensation that springs to life when the government takes private property. *See First Eng. Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 315 (1987). This stands in stark contrast to most other constitutional provisions

which do not expressly provide a remedy for a constitutional violation. *See id.* ("We have recognized that a landowner is entitled to bring an action in inverse condemnation as a result of the self-executing character of the constitutional provision with respect to compensation." (quotation omitted)). As the Supreme Court in *First English* observed:

> Claims for just compensation are grounded in the Constitution itself: The suits were based on the right to recover just compensation for property taken by the United States for public use in the exercise of its power of eminent domain. *That right was guaranteed by the Constitution.* The fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners did not change the essential nature of the claim. The form of the remedy did not qualify the right. It rested upon the Fifth Amendment. Statutory recognition was not necessary. A promise to pay was not necessary. Such a promise was implied because of the duty to pay imposed by the Amendment. *The suits were thus founded upon the Constitution of the United States.*

*Id.* at 315 (cleaned up). "[T]he Court has frequently repeated the view that, in the event of a taking, the compensation remedy is required by the Constitution." *Id.* at 316 (collecting cases).

Because of the self-executing nature of the Fifth Amendment, several appellate courts have concluded that a property owner may sue a state directly for takings in violation of the federal constitution, without having to proceed under § 1983. *See Manning*, 144 P.3d at 93 ("The Mannings' claim does not rely at all on congressional action. Rather, the just compensation claim stems directly from the text of the Constitution through the Fifth and Fourteenth Amendments."); *SDDS, Inc. v. State*, 650 N.W.2d 1, 9 (S.D. 2002) ("[T]he remedy [of just compensation found in the Fifth Amendment's Takings Clause] does not depend on statutory facilitation. Because it is a constitutional provision, it is a right of the strongest character."); *Boise Cascade Corp. v. Bd. of Forestry*, 991 P.2d 563, 567 (Or. Ct. App. 1999) ("In short, section 1983 does not provide for the remedy required by the constitution for a taking of property by the *state*."). This analysis is sound, and supported by basic logic. "Holding otherwise would expose more citizens to takings

without adequate compensation, contrary to the protections our Constitution provides." *Manning*, 144 P.3d at 92.

Admittedly, federal courts rarely hear federal takings claims against a state because a property owner cannot sue a state in federal court under the Eleventh Amendment. *See Lapides v. Bd. of Regents*, 535 U.S. 613, 616 (2002) ("The Eleventh Amendment grants a State immunity from suit in federal court by citizens of other States, and by its own citizens as well." (citation omitted)). Virtually the only time a takings claim against a state ends up in federal court is when a state waives its Eleventh Amendment immunity by removing a lawsuit to federal court. *See id.* (holding that "the State's act of removing a lawsuit from state court to federal court waives [Eleventh Amendment] immunity.").[3] That is exactly what occurred here.

To be clear, an individual is always free to file suit against a governmental entity, other than a state or state actor, under § 1983 for the "deprivation" of a right "secured by the Constitution." 42 U.S.C. § 1983. This includes the Fifth Amendment's Takings Clause. Most of the time, a property owner will find it advantageous to sue under § 1983 because a prevailing § 1983 plaintiff may, at the district court's discretion, obtain attorney's fees. *See id.* § 1988(b). Simply because a § 1983 action cannot be brought against a state government or a state actor, however, does not mean that a property owner is left without a remedy when it comes to a Fifth Amendment takings claim. In such a situation, a property owner can sue the State directly under the Fifth Amendment's Takings Clause. A takings plaintiff is not required to invoke § 1983.

---

[3] Technically, a property owner could sue a state directly in federal court and the state could elect to waive its Eleventh Amendment immunity by failing to raise sovereign immunity as a defense.

**2. The statute of limitations does not bar Plaintiffs' federal inverse condemnation claim.**

The State's statute of limitations argument is based entirely on the idea that Plaintiffs must bring their claim under § 1983. "Courts considering claims brought under § 1983 must borrow the relevant state's statute of limitations for personal injury actions." *Redburn v. City of Victoria*, 898 F.3d 486, 496 (5th Cir. 2018). In Texas, the statute of limitations for personal injury actions is two years. *See* TEX. CIV. PRAC. & REM. CODE § 16.003(a).

The State asserts that Plaintiffs' federal claims accrued when Hurricane Harvey hit the Texas Gulf Coast region in August 2017. Because Plaintiffs filed their lawsuit in May of 2020, more than two years after the federal claims allegedly accrued, the State maintains that any federal takings claim brought under § 1983 is time-barred. The State's limitations argument misses the mark completely. Although individuals seeking to vindicate their constitutional rights commonly use § 1983, Plaintiffs in this case do not rely on, invoke, or even reference § 1983 anywhere in the Complaint. Instead, Plaintiffs have sued the State for just compensation under the Fifth Amendment as incorporated against the states by the Fourteenth Amendment.

Because the constitution's framers did not supply a limitations period for a Fifth Amendment inverse condemnation claim against a state, I am required to "borrow" a period from state or federal law. *See N. Star Steel Co. v. Thomas*, 515 U.S. 29, 33 (1995). Rather than look to the limitations period generally used for § 1983 claims, Plaintiffs urge me to borrow the 10-year period set by Texas law for adverse possession cases or the six-year period established by Congress for inverse condemnation claims against the federal government. *See* Dkt. 45 at 13–14 (citing TEX. CIV. PRAC. & REM. CODE § 16.026 and 28 U.S.C. § 2501 respectively). In this case, it does not matter whether I select a six-year or 10-year limitations period. Plaintiffs are well within the statute of limitations either way because they filed this

action less than three years after the State contends the limitation period began to run.

### 3. The State waived both its sovereign immunity from suit and its sovereign immunity from liability.

In two short paragraphs in its Motion to Dismiss, the State argues that Plaintiffs' federal constitutional claims under the Fifth Amendment are subject to dismissal because the State enjoys sovereign immunity against such claims. The Fifth Circuit has recognized that "state sovereign immunity consists of two separate and different kinds of immunity, immunity from suit and immunity from liability." *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 254 (5th Cir. 2005). Immunity from suit bars suit against the State altogether while immunity from liability bars enforcement of a judgment against a State. *See Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). Immunity from suit is not at issue here, as the State concedes, because removing a case to federal court invokes the jurisdiction of the federal courts and waives a state's Eleventh Amendment immunity from suit. *See Benzing*, 410 F.3d at 255. The present dispute, instead, centers on whether the State has waived its immunity from liability.

The State argues that it has never waived its immunity from liability. I find this argument untenable. Article I, section 17 of the Texas Constitution, the State's version of the Fifth Amendment's Takings Clause, provides an undeniable waiver of governmental immunity for claims arising from an unconstitutional taking of property for public use without adequate compensation. *See* Tex. Const. art. I, § 17; *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980) ("The [Texas] Constitution itself . . . is a waiver of governmental immunity for the taking, damaging[,] or destruction of property for public use."); *Kirby Lake Dev. Ltd. v. Clear Lake City Water Auth.*, 321 S.W.3d 1, 5 (Tex. App.—Houston [14th Dist.] 2008), *aff'd*, 320 S.W.3d 829 (Tex. 2010) ("There is a clear and unambiguous waiver of immunity from suit for inverse-condemnation claims within the ambit of article I, section 17 of the Texas Constitution.").

Article I, section 17 of the Texas Constitution declares that "[n]o person's property shall be *taken, damaged, or destroyed* for or applied to public use without adequate compensation being made, unless by the consent of such person." TEX. CONST. art. I, § 17 (emphasis added). Importantly, the state constitutional provision "confers upon property owners greater rights of recovery against the government than its federal fifth amendment counterpart." *Palacios Seafood, Inc. v. Piling Inc.*, 888 F.2d 1509, 1513 (5th Cir. 1989). While Article I, section 17 allows for compensation for both a "taking" and "damaging" of property, the Fifth Amendment limits compensation to a "taking" of property. *See* U.S. CONST. amend V ("nor shall private property be *taken* for public use, without just compensation" (emphasis added)). It logically follows that if the State has expressly waived immunity from liability for the taking of property without adequate compensation, that clear and unambiguous waiver applies with equal force to takings claims whether they are based on the Texas Constitution or the Fifth Amendment to the United States Constitution. As Plaintiffs powerfully state: "By waiving immunity from liability for takings claims in its own courts, the State waived its claim of immunity from liability for Plaintiffs' Fifth Amendment takings claims as well." Dkt. 45 at 24. In a nutshell, sovereign immunity does not shield the State from Plaintiffs' claims based upon the taking of property. *See State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007).

On a related note, the United States Supreme Court has held that the "constitutional privilege of a State to assert its sovereign immunity in its own courts does not confer upon the State a concomitant right to disregard the [United States'] Constitution or valid federal law." *Alden v. Maine*, 527 U.S. 706, 754–55 (1999). Drawing support from *Alden*, several state appellate courts have concluded that, even without an express waiver of sovereign immunity, the text of the Fifth Amendment mandates a remedy of just compensation. These courts have held that the purpose of the Fifth Amendment's Takings Clause would be subverted if private takings claims against a state were blocked by sovereign immunity. *See Manning*,

144 P.2d at 95 (The Fifth Amendment's "Takings Clause creates a cause of action against a state which is actionable in state court and to which the state may not assert immunity."); *SDDS*, 650 N.W.2d at 8–9 ("The Fifth Amendment in general and the takings clause in particular are integral parts of the Constitution, and they are made applicable to the states through the Fourteenth Amendment. It follows that South Dakota's sovereign immunity is not a bar to SDDS's Fifth Amendment takings claim." (citation omitted)); *Boise Cascade*, 991 P.2d at 568 ("[A]t least some constitutional claims [including those under the Fifth Amendment's Takings Clause] are actionable against a state, even without a waiver or congressional abrogation of sovereign immunity, due to the nature of the constitutional provision involved."). I agree with and adopt the reasoning provided by these courts. *See also* Eric Berger, *The Collision of the Takings and State Sovereign Immunity Doctrines*, 63 WASH. & LEE L. REV. 493, 498 (2006) (arguing that the Takings Clause "trump[s] state sovereign immunity by automatically abrogating—or stripping—the immunity that states usually enjoy in actions at law").

### 4. Plaintiffs have properly pled a Fifth Amendment takings claim.

In seeking relief under the Fifth Amendment's Takings Clause, Plaintiffs must first establish that they had a "valid property interest at the time of the taking." *In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 248 (2019) ("*In re Upstream II*"). "The Supreme Court has repeatedly held that state law defines property interests." *In re Downstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 147 Fed. Cl. 566, 577 (2020) (quotation omitted). In Texas, the law recognizes both personal and real property as interests protected by the Takings Clause. *See City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 234–36 (Tex. 2011) (takings claim predicated on seizure of automobiles); *Steele*, 603 S.W.2d at 789 (takings claim predicated, in part, on destruction of personal belongings).

Against this legal backdrop, the State first contends that Plaintiffs have failed to sufficiently show that they have a compensable property interest. From

the State's perspective, Plaintiffs have claimed a property interest in being free
from "uncontrollable flooding resulting from an Act of God." Dkt. 44 at 10 (citing
*In re Downstream*, 146 Fed. Cl. at 577, 581). But that is a gross mischaracterization
of Plaintiffs' allegations. Plaintiffs allege that they rented, leased, or "owned
homes, fixtures, businesses, and/or personal property" that were damaged or
destroyed by stormwater stored on their property because the State erected and
maintained an impenetrable concrete barrier that effectively operated as a dam.
Dkt. 43 at 11. They further allege that the State's construction of the barrier
inundated their property with floodwater that prevented them from accessing their
properties and caused "significant erosion and loss of crops, grasses, and
groundcover." *Id.* The State's storage of rainfall on their properties also allegedly
caused "permanent damage, destruction, and loss of personal property including
appliances, furniture, tools, machinery, livestock, crops, vehicles, air conditioning
units, and similar personal property in addition to the tragic loss of hereditary
items and mementoes which can never be replaced." *Id.* at 12. These allegations,
taken as true, unquestionably allege a compensable property interest for purposes
of a Fifth Amendment takings claim.

The State next argues that its design, construction, maintenance, and
operation of the IH-10 concrete barrier is a "legitimate use[] of its police power,
which is an exemption to takings liability and damages in Texas." Dkt. 44 at 10.
There is no question that Texas property owners hold "their land subject to the
legitimate exercise of the police power to control and mitigate against flooding." *In
re Downstream*, 147 Fed. Cl. at 578. At the same time, "the state cannot commit a
physical taking, by taking or destroying property, and escape liability for
compensation by merely 'labeling the taking as an exercise of the police powers.'"
*City of Dallas*, 347 S.W.3d at 254 (Wainwright, J., dissenting) (quoting *Steele*, 603
S.W.2d at 789). The Texas Supreme Court has described the interplay between the
Takings Clause and police power as follows:

> The polic[e] power is not an arbitrary one, [it has] its limitations. Thus it is subject to the limitations imposed by the Constitution upon every power of government, and will not be permitted to invade or impair the fundamental liberties of the citizen. Also it is founded in public necessity and only public necessity can justify its exercise. . . . But the police power is subordinate to the right to acquire and own property, and to deal with it and use it as the owner chooses, so long as the use harms nobody. [The police power] may be invoked to abridge the right of the citizen to use his private property when such use will endanger public health, safety, comfort or welfare—and only when this situation arises.

*Lombardo v. City of Dallas*, 73 S.W.2d 475, 478–79 (Tex. 1934). So while a governmental entity "is not required to make compensation for losses occasioned by the proper and reasonable exercise of its police power," determining whether such exercise was reasonable and proper requires "consider[ation of] all of the circumstances" using "a fact-sensitive test of reasonableness." *City of Coll. Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex. 1984). Further, the State may invoke the police power to limit a landowner's property rights "only" where the landowner's "use will endanger public health, safety, comfort or welfare." *Lombardo*, 73 S.W.2d at 479.

Plaintiffs claim that the State installed the IH-10 barrier "to enhance public safety and to facilitate use of its eastbound (southside) lanes as an evacuation route during periods of flooding by confining water to the westbound lanes (northside)." Dkt. 43 at 2. This allegation, taken as true, meets the Plaintiffs' low pleading burden, especially given the factually intensive question presented when a government raises a police power defense. *See In re Upstream II*, 146 Fed. Cl. at 263–264 ("[I]t was not that the government had to respond to Tropical Storm Harvey as an emergency that necessitated the flooding of private land, but rather that the government had made a calculated decision to allow for flooding these lands years before Harvey." (quotation omitted)); *In re Upstream I*, 138 Fed. Cl. at 664 ("Due to the fact-intensive nature of takings cases, trial courts tend to be slow to dismiss them, and to create a record with detailed findings of fact." (cleaned

up)). At this early pleading stage, it is entirely inappropriate to throw the case out on the State's mere assertion that its efforts to control and mitigate against flooding constitute legitimate uses of its police power.

The State cites to *In re Downstream* as binding, while Plaintiffs allege that *In re Upstream I* and *In re Upstream II* provide the more analogous comparison. The referenced cases involve takings claims brought against the U.S. Army Corps of Engineers for their operation of the Addicks and Barker Dams, located in Northwest Houston, during Hurricane Harvey. Judge Loren Smith described the differences between these cases as follows:

> In [*In re Upstream II*], Senior Judge [Charles] Lettow determined that the taking of upstream property occurred as a result of the general operation of the Addicks and Barker Dams and Reservoirs, as a direct result of the Corps' decision to close the flood gates in order to protect properties downstream at the expense of the upstream properties located within the maximum pool size for the reservoirs. In contrast, the Downstream plaintiffs do not allege that the general operation of the Reservoirs caused the flooding of their property. Rather, plaintiffs downstream advance a takings theory predicated on the Corps' decision to open the flood gates and begin Induced Surcharge releases . . . . [T]he downstream plaintiffs' theory of causation ignores the simple fact that the gates were initially closed for the sole purpose of protecting *their* properties from floodwaters, that such mitigation failed because the impounded storm waters exceeded the Reservoirs' controllable capacity, and that . . . Harvey was the sole and proximate cause of the floodwaters.

*In re Downstream*, 147 Fed. Cl. at 575 (citations omitted). In short, the downstream plaintiffs sought compensation for the government's decision to open the floodgates when the "impounded storm waters exceeded the Reservoirs' controllable capacity" due to the exceptional amount of rain caused by Hurricane Harvey, an "Act of God." *Id.* By contrast, the upstream plaintiffs sought compensation for the government's decision to build dams near their properties in the first place, placing their properties at increased risk of flooding all for the "sole purpose" of protecting downstream properties. *Id.* In *In re Upstream II,* the Court of Federal Claims rejected the Army Corps of Engineers' request to dismiss the case

on a police power argument because "the design of the dams contemplated flooding beyond government-owned land onto private properties." *In re Upstream II*, 146 Fed. Cl. at 263. *See also In re Upstream I*, 138 Fed. Cl. At 669 (deferring the matter until trial under Rule 12(i)). The Court of Federal Claims reasoned that "it was not that the government had to respond to Tropical Storm Harvey as an emergency . . . but rather that the government had made a calculated decision to allow for flooding these lands years before Harvey." *In re Upstream II*, 146 Fed. Cl. at 263–64.

Here, Plaintiffs allege that the State constructed and maintained the IH-10 concrete centerline barrier for the sole purpose of protecting public access to the highway's southside lanes at the expense of northside property owners. In other words, the State protected public property and private property to the south of the barrier only by preventing rainfall on the northside from following its natural course south towards the Gulf of Mexico. The State's barrier allegedly burdened Plaintiffs' property with a permanent flowage easement, putting Plaintiffs' property to public use without their consent and without just compensation. This allegation is a direct corollary to the allegations made by the upstream plaintiffs. Plaintiffs do not claim that the State took their property by failing to provide "perfect flood control" because, according to Plaintiffs, the concrete barrier performed exactly as the State intended it to perform—inundating northside property owners with water that would otherwise flow south towards the Gulf of Mexico. Again, it is not my role at this preliminary juncture in the case to make credibility determinations or otherwise rule on the merits. These allegations survive a motion to dismiss.

## B.   PLAINTIFFS' STATE INVERSE CONDEMNATION CLAIM

The State also argues that Plaintiffs have failed to state a valid takings claim under Article I, Section 17 of the Texas Constitution. Specifically, the State avers that Plaintiffs' state constitutional takings claim fails as a matter of law because (1) they "cannot point to such evidence . . . that [the Texas Department of

Transportation] knew the concrete barrier would create a dam-effect and flood property;" (2) they "failed to plead (and cannot plead) how the State made conscious decisions to release water onto their properties;" and (3) "Plaintiffs lack the pleadings to show the State's knowledge and decision-making showed it *knew* Plaintiffs' property would flood." Dkt. 46 at 7–8. I completely disagree.

As noted, the Texas Constitution provides that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." TEX. CONST. art. I, § 17(a). That provision also creates an exception to takings liability for "an incidental use by (A) the State, a political subdivision of the State, or the public at large, or (B) an entity granted the power of eminent domain under law." *Id.* § 17(a)(1)(A)–(B). In other words, "[m]ere negligence is not a compensable taking." *Van Deelen v. Spring Indep. Sch. Dist.*, No. 14-17-00432-CV, 2018 WL 6684278, at *9 (Tex. App.—Houston [14th Dist.] Dec. 20, 2018, no pet.). To state a valid takings claim under the Texas Constitution, Plaintiffs "must prove (1) the state intentionally performed certain acts, (2) that resulted in a 'taking' of property, (3) for public use." *Gen. Servs. Comm'n v. Little-Tex. Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001). The first element—the state's intent—is satisfied "when a governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result." *Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799 (Tex. 2016) (quotation omitted).

There is no doubt in my mind that Plaintiffs have plausibly stated that the State's use of their property was more than incidental, meaning that the State has no immunity from liability. Not only have Plaintiffs alleged that the State knew or was substantially certain that the concrete barrier would cause flooding on the northside of IH-10, *see* Dkt. 43 at 3–4, 8, 13, 19, and 21, but they have also pointed to specific ways in which discovery might help them to prove those allegations at trial. *See id.* at 21–23. Viewing the allegations in the light most favorable to Plaintiffs, as I must at this early stage, Plaintiffs have made a valid claim for inverse

condemnation under Texas law that is plausible on its face. Because I find that Plaintiffs have made a valid claim for inverse condemnation, Texas law does not provide the State with immunity from liability separate from its immunity to suit. *See El Dorado Land Co., L.P. v. City of McKinney*, 395 S.W.3d 798, 801 (Tex. 2013) ("A statutory waiver of immunity is unnecessary for a takings claim because the Texas Constitution waives governmental immunity for the taking, damaging or destruction of property for public use." (quotation omitted)).

## CONCLUSION

For the reasons identified above, I recommend that Defendant's Motion to Dismiss Plaintiffs' Amended Master Complaint (Dkt. 44) be **DENIED**.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED this 30th day of July 2021.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE