# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| RICHARD & WENDY DEVILLIER, et al.,<br>Plaintiffs, | § | Civil Action No. 3:20-cv-00223 |
| | § | |
| | § | |
| v. | § | |
| | § | Jury Trial Demanded |
| THE STATE OF TEXAS,<br>Defendant. | § | |
| | § | |
| | § | |

# PLAINTIFFS' POST-HEARING BRIEF
## IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

I.    Each Plaintiff Need Not Prove The State Had A Subjective Intent To Take, Damage, Or Destroy Their Specific Property To Pursue An Inverse Condemnation Action Under The Texas Constitution. ......................................................................................................... 1

II.    The Hearing Record Confirms All Rule 23 Prerequisites Have Been Met; The Determination Of The State's Liability To Plaintiffs Should Be Certified. ................................................................ 7

    A.    Rule 23(a) has been met for all Plaintiffs' claims. .................................... 8

    B.    The Rule 23(b)(2) requirements have been met. ................................... 14

    C.    The Rule 23(b)(3) requirements have been met. ................................... 16

        1.    Common issues—including the legal standard and factual proof to prove intent for both claims on which Plaintiffs seek certification—predominate over any individual proof needed for their determination. .................................................................... 16

        2.    Resolution of the State's liability to Plaintiffs as to both their state and federal claims in a single proceeding is a superior procedure to that of holding hundreds of individual trials. ........................................... 19

CONCLUSION ......................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)..................................................................................................18

*Armstrong v. United States*,
  364 U.S. 40 (1960) ....................................................................................................5

*Bass Enterprises Prod. Co. v. United States*,
  133 F.3d 893 (Fed. Cir. 1998)..................................................................................19

*Batts v. Tow–Motor Forklift Co.*,
  66 F.3d 743 (5th Cir. 1995).......................................................................................4

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
  242 F.3d 290 (5th Cir. 2001)....................................................................................14

*Brazos River Auth. v. City of Graham*,
  354 S.W.2d 99 (Tex. 1961).................................................................................4, 18

*Chen-Oster v. Goldman, Sachs & Co.*, No.
  10CIV6950ATRWL, 2022 WL 814074 (S.D.N.Y. Mar. 17, 2022)........................19

*City of Austin v. Travis County Landfill Co.*,
  73 S.W.3d 234 (Tex. 2002).......................................................................................17

*City of Dallas v. Jennings*,
  142 S.W.3d 310 (Tex. 2004).............................................................................. passim

*Cleven v. Mid-Am. Apartment Comms.*,
  328 F.R.D. 452 (W.D. Tex. 2018)..............................................................................8

*Cotton Land Co. v. United States*,
  75 F. Supp. 232 (Ct. Cl. 1948) ..................................................................................1

*DeOtte v. Azar*,
  332 F.R.D. 188 (N.D. Tex. 2019) ...........................................................................8, 9

*Earl v. Boeing Co.*,
  339 F.R.D. 391 (E.D. Tex. 2021)...............................................................................8

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ...................................................................................................9

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) ...................................................................................................9

*Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Texas), L.P.*,
  449 S.W.3d 474 (Tex. 2014).....................................................................................19

*Hansen v. United States*,
  65 Fed. Cl. 76 (2005)..................................................................................................1

*Harris Cnty. Flood Control Dist. v. Kerr*,
499 S.W.3d 793 (Tex. 2016) ............................................................................ 3

*Howard v. City of Kerrville*,
75 S.W.3d 112 (Tex. App.—San Antonio 2002, pet. denied) ............................... 20

*In re Deepwater Horizon*,
785 F.3d 1003 (5th Cir. 2015) ....................................................................13, 14

*In re Rodriguez*,
695 F.3d 360 (5th Cir. 2012) .......................................................................... 15

*In re Upstream Addicks and Barker (Texas) Flood-Control Reservoirs*,
146 Fed. Cl. 219 (2019) .............................................................................17, 20

*Jim Olive Photography v. University of Houston Sys.*,
624 S.W.3d 764 (Tex. 2021) ........................................................................... 13

*Luby v. City of Dallas*,
396 S.W.2d 192 (Tex. Civ. App.—Dallas 1965, writ ref'd n.r.e.) ......................... 13

*Mayhew v. Town of Sunnyvale*,
964 S.W.2d 922 (Tex. 1998) ........................................................................... 19

*Penn Central Transp. Co. v. City of New York*,
438 U.S. 104 (1978) ....................................................................................... 19

*Prantil v. Arkema, Inc.*,
986 F.3d 570 (5th Cir. 2021) .......................................................................... 16

*Ridge Line, Inc. v. United States*,
346 F.3d 1346 (Fed. Cir. 2003) ....................................................................... 17

*Seeligson v. Devon Energy Prod. Co., L.P.*,
761 F. App'x 329 (5th Cir. 2019) ...................................................................... 8

*Sheffield Dev. Co. v. City of Glenn Heights*,
140 S.W.3d 660 (Tex. 2004) ........................................................................... 19

*Skeen v. State*,
550 S.W.2d 713 (Tex. Civ. App.—El Paso 1977, writ ref'd n.r.e.) ...................... 13

*Steele v. City of Houston*,
603 S.W.2d 786 (Tex. 1980) ........................................................................5, 18

*Stukenberg v. Perry*,
675 F.3d 832 (5th Cir. 2012) .......................................................................... 15

*Tarrant Reg'l Water Dist. v. Gragg*,
151 S.W.3d 546 (Tex. 2004) ..................................................................... 4, 18, 20

*United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*,
414 F.3d 558 (5th Cir. 2005) ............................................................................ 4

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ..................................................................................................9, 20

*Yates v. Collier,*
  868 F.3d 354 (5th Cir. 2017) .................................................................................. 15

*Yuba Natural Resources, Inc. v. United States,*
  821 F.2d 638 (Fed. Cir. 1987) ................................................................................. 19

## Rules

Fed. R. Civ. P. 23(a) ........................................................................................................ 8

Fed. R. Civ. P. 23(b)(2) .................................................................................................. 2

Fed. R. Civ. P. 23(b)(3) .................................................................................................. 2

Fed. R. Civ. P. 23(c)(4) .................................................................................................. 2

## Other Authorities

Texas Department of Transportation, <u>Hydraulic Design Manual</u> at 5-8
  (*http://onlinemanuals.txdot.gov/txdotmanuals/hyd/txdot_and_the_nfip.htm*) ...............................6-7

## Regulations

79 Fed. Reg. 61370 ........................................................................................................ 6

80 Fed. Reg. 72473 ........................................................................................................ 6

# INTRODUCTION

At the conclusion of the hearing on class certification the Court asked for additional briefing regarding how the testimony and exhibits presented impact "every factor under the sun"—<u>without</u> duplication of the briefing previously provided. Exhibit A, Transcript of June 14, 2022 Hearing, at 252:15-18, 253:11. In particular, the Court sought input regarding the legal standard of intent required to pursue an inverse condemnation claim under the Texas Constitution, and whether the record contained *prima facie* evidence to meet that standard. It is with the latter inquiry Plaintiffs begin.

The hearing revealed that the State knew—without doubt—that its Project would result in the impoundment of detained water along the northern side of Interstate Highway 10 ("IH-10"). It knew the elevations. And, if it cared to look, the State could have determined each parcel within that elevation which its Project would flood. That is enough under Texas law to pursue an inverse condemnation claim. With that piece in place, the evidence and testimony compel certification of the Class and Subclasses.

## I. Each Plaintiff Need Not Prove The State Had A Subjective Intent To Take, Damage, Or Destroy Their Specific Property To Pursue An Inverse Condemnation Action Under The Texas Constitution.

According to the State, an inverse condemnation claim brought under art. I sec. 17 of the Texas constitution requires proof that, to maintain an inverse condemnation action, the State must have <u>known</u>, or have been <u>substantially certain</u>, that the <u>specific property</u> of the <u>particular plaintiff</u> would be taken, damaged, or destroyed by its public use project.[1] Under the

---

[1] Of course, this argument in no way applies to Plaintiffs' federal Takings Clause claims. *See Hansen v. United States*, 65 Fed. Cl. 76, 106 (2005) ("Causation thus does not require proof that government agents must have specifically intended, and thus could foresee, the specific harm that resulted in the taking."); *Cotton Land Co. v. United States*, 75 F. Supp. 232, 232-35 (Ct. Cl. 1948) (finding causation

State's interpretation, an inverse condemnation claim cannot be brought absent proof that the State knowingly identified a specific citizen's property and, thereafter, took it. Further the State contends that, with ample knowledge and warning about upstream flooding (and despite an obligation to evaluate upstream flooding), the State would be free from liability as long as it ignored the obvious result of its planned actions: that self-same upstream flooding. Or, as characterized by the Court's question: "if the State was on notice that there was a potential for there to be flooding on the upstream, could the State just put on blinders and say, whoa, I didn't know that any particular piece of property would be impacted?" Exhibit A at 248:12-16. The answer is no. And the State's position, urging the contrary, must be rejected.

In *City of Dallas v. Jennings*, the Texas Supreme Court stated that a governmental entity may be held liable for the taking, damage, or destruction of private property in order to confer a public benefit if it "(1) knows that a specific act is causing identifiable harm; **_or_** (2) knows that the specific property damage is substantially certain to result from an authorized government action — that is, that the damage is 'necessarily an incident to, or necessarily a consequential result of' the government's action." 142 S.W.3d 310, 314 (Tex. 2004) (emphasis added) (quoting *Texas Highway Dep't v. Weber*, 219 S.W.2d 70, 71 (Tex. 1949)). This disjunctive standard does not limit inverse condemnation actions to those where the State subjectively knew and intended the taking, damage, or destruction of a specific parcel of property. While the State's knowledge of damage to a specific parcel due its actions would satisfy *Jennings*,

---

where the record showed that, if the government engineers had studied the question in advance, they would have foreseen the potential for flooding). As argued *infra*, the Class and Subclasses should be certified under Rule 23(b)(2) for Plaintiffs' declaratory judgment action under Count 5, and under Rules 23(b)(3) and (c)(4) as to the State's liability under the Takings Clause of the Fifth Amendment.

neither prong demands knowledge of the specific property to be taken. And, at base, the State's interpretation of *Jennings* is contrary to the statement in *Jennings* itself which rejected any notion that the State must have the intent to cause the plaintiff's damage. 142 S.W.3d at 314 ("Nor do we believe, however, that the City must necessarily intend to cause the damage; if the government knows that specific damage is substantially certain to result from its conduct, then takings liability may arise even when the government did not particularly desire the property to be damaged.").

The Texas Supreme Court has described the knowledge standard as focusing on "mens rea" to make "clear that a taking cannot be established by proof of mere negligent conduct by the government." *Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799 (Tex. 2016) (op. on reh'g). Reading *Jennings'* dual prongs as proving dual bases to prove intent captures these concepts and honors the language of the decision: intent may be demonstrated by proof that the governmental entity either knows its action "is causing identifiable harm" (i.e., in the present) or knows a specific damage "is substantially certain to result" from its anticipated action (i.e., in the future). The State's position fits within (but does not test the limits of) the first prong. But it relies on a misstatement of the second prong to support its logic.

Clearly, if the State knows that its project is taking, damaging, or destroying a specific property of a particular person, then it knows it "is causing identifiable harm" (satisfying the first aspect of the *Jennings* standard). But the State twists the second prong of *Jennings*, which calls for knowledge about "specific property damage"—not "damage to specific property"— when it focuses on the anticipated damage in the future. The standard applicable to future events applies to the actions taken by the State before flooding occurred. But that standard

only asks whether the property damage "is substantially certain to result" from the State's anticipated action. It imposes no property-specific knowledge.

Plaintiffs' straightforward reading of the *Jennings* dual standard comports with the Supreme Court's guidance that the intent standard be tied to the "public use" element of the state law takings claim.[2] As noted above, the Texas Supreme Court made it clear that if the government entity knows a specific property damage is substantially certain to result by its conduct, takings liability may arise even if the government entity did not desire that any specific property be damaged. *Jennings*, 142 S.W.3d at 314. As the Court explained in *City of San Antonio v. Pollock*, 284 S.W.3d 809, 820-21 (Tex. 2009), the intent analysis is "rooted in the constitutional provision that a compensable taking occurs only if property is damaged or appropriated for or applied to public use. An accidental destruction of property does not benefit the public. The public-use limitation is the factor which distinguishes a negligence action from one under the constitution for destruction." *See also Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554-55 (Tex. 2004) (providing that "we seek to ensure that the public does not bear the burden of paying for property damage for which it received no benefit").[3]

---

[2] The State stipulated that the claims satisfy the "public use" element of the Texas Constitution. ECF 85, Stipulation 13. The intent standard is thereby satisfied if it is shown the Project plans or construction presuppose the upstream flooding (the specific damage), or if the upstream flooding is a known result of the Project's design, construction, operation, or maintenance as intended. *Gragg*, 151 S.W.3d at 555; *Brazos River Auth. v. City of Graham*, 354 S.W.2d 99, 107-08 (Tex. 1961).

[3] To the extent this Court feels this issue requires it to make an "*Erie*-guess," its task is to determine how the Supreme Court of Texas would decide the question. *See, e.g., Batts v. Tow–Motor Forklift Co.,* 66 F.3d 743, 749 (5th Cir. 1995). "While decisions of intermediate state appellate courts provide guidance, they are not controlling. If a state's highest court has not ruled on the issue in question, a federal court must determine, to the best of its ability, what the highest court of the state would decide." *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 565–66 (5th Cir. 2005) (emphasis added) (citations omitted).

---

In keeping with this concern, the intent element can be satisfied where the governmental entity knows that its project is substantially certain to cause a specific kind of property damage (i.e., flooding and/or imposition of an easement) in the course of providing the public benefit which the project is intended to provide (i.e., building an impenetrable barrier and/or detaining stormwater upstream to protect downstream). The State need not know precisely <u>which</u> properties it will damage, only that the specific type of property damage is substantially certain to occur as a result of its public project.

Plaintiffs' reading of *Jennings* also serves to ensure that the government does not force some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole merely because the State does not know <u>which</u> of its citizens will be forced to bear that burden. *Steele v. City of Houston*, 603 S.W.2d 786, 789 (Tex. 1980) (citing *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). That is precisely what happened here. As the State admitted both in testimony and its documents, the State knew upstream properties would flood from rainfall as mild as a 50-year storm but decided <u>against</u> implementing the drainage improvements necessary to prevent that eventuality, choosing instead to protect the downstream properties Exhibit 54, 72; Exhibit A at 190:9-25, 196:13-22, 198:12-199:24.

The State knew the Project would detain water to a certain elevation (expressed in the graphic below as the difference between Elevation X and Elevation X+Y). And the State knew that detained water would flood private upstream properties.



Exhibit 91. The State even described the upstream storage area: "the VAST natural detention provided by the low-lying [upstream] area indicative of southeast Texas (rice fields and crawfish farms)." Exhibit 3; *see also* Exhibit 49, Exhibit A at 189:1-20, 198:7-201:14, 205:6-20, 206:12-209:19. And TxDOT continued its Project—without change—even <u>after</u> flooding upstream properties during Harvey. That confirms subjective knowledge of the flooding that was "substantially certain to occur" a mere two years later during Imelda. *See* Exhibit A at 186:21-188:6, 211:11-213:2.

Finally, crediting the State's intent standard would permit the State to evade its constitutional responsibility while violating both federal law and the Memorandum of Understanding between the State of Texas and the Federal Highway Administration. *See* 79 Fed. Reg. 61370, 80 Fed. Reg. 72473 (noting Texas has assumed responsibilities under NEPA for construction of federal highways in this State); Exhibit 4 (discussing NEPA requirements). As Adam Jack acknowledged, NEPA requires the State to study the potential for upstream flooding when it builds a highway for the federal highway system. Exhibit A at 213:3-23. Indeed, as TxDOT's own Hydraulic Design Manual recognizes, significant liability can arise when it fails to adhere to the required hydrologic and hydraulic study obligations when designing and constructing its projects. *See* Texas Department of Transportation, <u>Hydraulic

Design Manual at 5-8 (*http://onlinemanuals.txdot.gov/txdotmanuals/hyd/txdot_and_the_nfip.htm*) ("Every designer for TxDOT has an obligation not to put TxDOT in a position of liability due to their design. The need for documentation that supports and protects TxDOT from lawsuits or liability claims is the reason for the inclusion of the required details in the plan set as engineering documents on sealed sheets."). The State may <u>not</u> avoid its constitutional obligation by choosing (as it did here) to put on blinders as to the specific parcels of upstream properties that it knew would be flooded by its project.

Neither *Jennings* nor any Texas Supreme Court opinion permits or encourages the State's approach. And the State's overreach demonstrates the weakness of its position. Only by twisting Texas law (and ignoring the Federal Constitution) can its actions be permitted. By contrast, following *Jennings* (and, in particular, the second prong), the State should be held liable for a taking under the Texas Constitution (and in keeping with the Federal Constitution) because, even before the Project, the State knew "that the specific property damage [i.e., upstream flooding] [wa]s substantially certain to result from an authorized government action [i.e., raising the highway and the barrier]" and, beyond question, "the damage [i.e., upstream flooding] is 'necessarily an incident to, or necessarily a consequential result of' the government's action [i.e., raising the highway and the barrier]." *Jennings*, 142 S.W.3d at 314.

## II. The Hearing Record Confirms All Rule 23 Prerequisites Have Been Met; The Determination Of The State's Liability To Plaintiffs Should Be Certified.

All required showings under Rule 23 to compel certification of the question whether the State is liable to Plaintiffs for both their state and federal inverse condemnation claims are satisfied here. The Class and Subclasses should be certified as requested.

## A. Rule 23(a) has been met for all Plaintiffs' claims.

The State stipulated that the Rule 23(a) requirements of numerosity and adequacy of class counsel are met. ECF 85, Stipulation 18. And the hearing record shows the remaining Rule 23(a) requirements of ascertainability, commonality and typicality, and adequacy of the proposed Class Representatives are met as well for both the state and federal claims.

***Ascertainability*** is met because all class members can be identified "at some stage in the proceeding" through "claimant-generated information [showing] objective criteria from which membership in the class can be determined." *Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 333-34 (5th Cir. 2019); *Earl v. Boeing Co.*, 339 F.R.D. 391, 422 (E.D. Tex. 2021). The parties agree that the real property records of Chambers, Liberty, and Jefferson counties "provide objective, confirmable evidence of the ownership of real property parcels within the geographic area alleged by Plaintiffs to have been encompassed by the impounded reservoir pool created by the State's Project on the dates of both Tropical Storms Harvey and Imelda." ECF 85, Stipulation 8. Those claimants who held leasehold interests or lost personal property can be objectively determined through affidavit evidence and objective criteria regarding the dates, location, and elevation of their leaseholds and their personal property losses. *See Earl*, 339 F.R.D. at 423 (individualized determination of class membership does not preclude certification); *Cleven v. Mid-Am. Apartment Comms.*, 328 F.R.D. 452, 467 (W.D. Tex. 2018) ("Even if manual review were necessary to ascertain every member of the class, Plaintiffs have still shown that the class is identifiable by objective criteria. Manual review does not preclude ascertainability."), *rev'd on other grounds*, 20 F.4th 171 (5th Cir. 2021); *see also DeOtte v. Azar*, 332 F.R.D. 188, 197 (N.D. Tex. 2019) (ascertainability not defeated where class membership was

dependent on individual assertion of religious belief to be subjectively determined for each class member).

"The **commonality** and **typicality** requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). The existence of a single common issue of law <u>or</u> fact, shared by all Class Members, the determination of which "will resolve an issue that is central to the validity of each one of the claims" meets the dual, related requirements. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)); *see also DeOtte*, 332 F.R.D. at 200 ("Like in *Wal-Mart*, the crux of this case is commonality and typicality is essentially redundant of that assessment."). The Class and Subclasses meet the "bottom-line question under commonality and typicality [because] the relief the named plaintiffs seek from the Court will resolve all class members' legal claims." *DeOtte*, 332 F.R.D. at 200.[4] The parties have stipulated as to the existence and commonality of substantive issues:

- The substantive issues that will control the outcome at a liability trial concern the State's design, construction, operations, and maintenance of Interstate Highway 10, and whether the State's actions caused the flooding of private properties to the north of Interstate Highway 10 owned or leased by the Class and Subclass Members; and

- The proof of liability *vel non* for Counts 1 and 2 of the Amended Master Complaint will not vary with regard to the operative facts regarding the State's actions and the hydrologic and hydraulic factors implicated by the State's construction projects for IH

---

[4] As the Court noted, at this stage of the proceedings "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).

10 (CSJs 0508-03-062; 0508-03-066; 0739-01-029; 0739-01-039; 0739-02-160; 0739-02-161; 0739-02-162).

ECF 85, Stipulations 14, 31.

In addition, evidence and testimony at the certification hearing provided other common questions shared (and typical) between the Class Representatives and all claimants. These additional common/typical issues confirm these standards are amply met.

Professor Michael Slattery's methodology to determine whether any specific parcel of property was flooded by the State-created pool created during Tropical Storms Harvey and/or Imelda uses data and analyses which do not vary dependent on the location, physiographic properties, or ownership of any individual parcel.[5] Exhibit A at 105:16-108:15 (Professor Slattery explaining the methodology and noting he has already begun the modeling, has encountered no problems in using the outlined methodology, and that he has the ability to change to an alternative methodology should the need arise); *see also* Exhibits 25 & 26 (Declarations of Dr. Michael Slattery and Dr. Anish Khanal discussing data and methodology by which common question of whether any specific, individual parcel of property suffered inundation because of State's Project can be determined by a single analysis). Even the questions of whether a claimant was flooded by a source other than the State's Project—such

---

[5] The parties stipulated that the two witnesses presented, Professor Slattery and Mr. Adam Jack, were "qualified to give opinion testimony on the topics addressed in the declarations each previously provided in this case." ECF 85, Stipulation 32. In addition to the testimony outlined in the body of this briefing, Dr. Slattery's testimony provided at the hearing demonstrated how his analysis and methodology satisfied the Rule 702 reliability requirement for a Court's reliance on scientific evidence for certification. Exhibit A at 123:8-125:1 (discussing fact that the methodology being used is a standard hydrologic approach to determining land inundation, as opposed to one created just for litigation, and will determined the extent of any impounded pool in three scenarios: with no Project, with the State's Project at the time of Harvey, and with the State's Project at the time of Imelda).

as riverine flooding—will be answerable by the experts' singular, uniform work in this case. Exhibit A at 112:11-21; *see also id.* at 119:6-120:24 (explaining how model of surcharged area will confirm—using a single, consistent methodology—which properties flooded because of the State's Project as opposed to a different causation); 121:15-123:2 (addressing why questions concerning specific or differing structures or impervious cover do not impact analysis). The overarching expert methodology supports both commonality and typicality in the Rule 23 analysis.

Likewise, the State's expert Mr. Jack[6] confirmed the existence of common issues, typical as between all Class Member, which are subject to singular, determinative proof:

- That there exists a singular design, planning, construction, operation, and maintenance for the Project, Exhibit A at 171:15-172:7, 180:23-181:16, 184:12-16;

- That the State used, and obtained results from, a singular process used (some of which is required under federal law) for its hydrologic analysis for the Project, Exhibit A at 131:16-132:2, 186:14-20;

- That the analysis did not vary for the Project simply because it was bid on and constructed through different Control-Section-Job ("CSJ") segments – it remained a single Project, Exhibit A at 133:25-134:4, 180:11-21;

- That it is TxDOT's practice to assess drainage issues only as to each individual culvert or bridge and not beyond that immediate space into any upstream locations, Exhibit A at 133:20-24, 134:5-21 (admitting the term "watershed" is limited to the geographic area from which water drains to a specific culvert or bridge), 134:8-10 ("We would not examine anything beyond that watershed and geographic boundary."), 165:10-17 (TxDOT studies nothing outside of areas that immediately drain to a given culvert);

- That the State "felt there was no need to go into an in-depth analysis" to determine "what effect, if any, the project would have on flooding the surrounding areas" because

---

[6] Mr. Jack is the Director of Transportation, Planning, and Development for the Beaumont District of the Texas Department of Transportation and in that role oversaw the State Project at issue from its design and planning through its construction.

the additional amount of water flowing to any specific culvert <u>from its limited</u> <u>"watershed" area</u> was deemed "negligible," Exhibit A at 161:25-162:8;[7]

- That the State first challenged, and then manipulated, and then <u>ignored</u> the analysis of its own hydrology experts to justify its desire to protect downstream properties from flooding <u>during a 50-year storm event</u> by storing excess rainfall runoff on properties upstream of the highway - and to do that <u>without</u> having to disclose and justify that decision at a public hearing, Exhibit A at 189:1-20, 190:9-191-5, 194:19-23, 196:23-199:24, 205:2-20, Exhibit 49, Exhibit 54, Exhibit 72; and, therefore,

- <u>That TxDOT did not assess any upstream impacts of this Project</u>, Exhibit A at 135:24-136:12 (no comprehensive analysis of the Project's potential overall impact to upstream properties was ever performed; impacts were assessed only per individual crossings or culverts), 166:15-24, 207:1-208:3 (despite urging by its own hydrology experts, TxDOT refused to authorize an analysis of impacts to upstream properties from their use as storm water storage areas).

As the Court itself noted, Mr. Jack's testimony cemented that the State's position is it "was not aware of the risk of any upstream flooding before this project." Exhibit A at 173:15-22, 222:18-22. Even though he also testified that he knew that the result of "not agreeing with [the State's] own hydrologist would make the water stay upstream, which would cause upstream flooding," Exhibit A at 201:6-14; and that TxDOT directed its contractors to "cease all design efforts" to add drainage capacity, and went on to build the Project, <u>knowing it would</u> <u>cause upstream flooding</u>, Exhibit A at 208:22-209:19, 240:1-241:10, 242:7-22, Exhibit 54. Therefore, as the Court noted, the parties' positions as to the intent required for liability under state law renders the issue ripe for uniform determination. Exhibit A at 247:22-248:3.

And the ***adequacy*** of the proposed Class Representatives has been demonstrated. No conflicts exist between the Class Representatives and the members of the Class and Subclasses,

---

[7] As Mr. Jack also testified, the State is required to base its culvert drainage capacity on water expected during a 50-year event and its bridge drainage capacity using a 100-year event. Exhibit A at 140:8-141:10. And when doing so, Mr. Jack again confirmed the State <u>only</u> focuses on the immediately adjacent area which drains to a particular drainage facility. Exhibit A at 141:11-15.

and each representative has demonstrated the willingness and ability to serve. *See* ECF 85, Stipulation 30(a)-(h). The State's sole argument—that the lack of a political subdivision as a Class Representative somehow renders the proposed representatives inadequate—remains an unexplained and unproven assertion. All Class Representatives own real and/or personal property alleged to have been flooded by the State's actions. Public entities also own real and/or personal property alleged to have been flooded by the State's actions and therefore are "part of the class and possess the same interest and suffer the same injury as the class members." *In re Deepwater Horizon*, 785 F.3d 1003, 1015 (5th Cir. 2015). There is no conflict, perceived or actual, which renders the Class Representatives inadequate for this matter.

The State's argument that personal property losses are not recoverable for a claim based on the Texas Constitution is simply wrong. In *Jim Olive Photography v. University of Houston Sys.*, 624 S.W.3d 764 (Tex. 2021), the Texas Supreme Court undertook an extensive analysis of whether a copyright infringement claim could rise to the level of a constitutional taking. And, while the Court found the facts before it did not constitute a taking, it explicitly recognized that personal property could be taken, noting that the justification for the per se rule that the "physical occupation" of property constitutes a taking "is equally applicable to a physical appropriation of personal property." 624 S.W.3d at 775-76. *See also Skeen v. State*, 550 S.W.2d 713, 715 (Tex. Civ. App.—El Paso 1977, writ ref'd n.r.e.) (reversing trial court judgment in favor of the State and the Texas Highway Department and rendering judgment in favor of the Skeens for the taking of their real and personal property). Texas law is clear on this point.[8]

---

[8] The State's reliance on *Luby v. City of Dallas*, 396 S.W.2d 192 (Tex. Civ. App.—Dallas 1965, writ ref'd n.r.e.), is misplaced. In *Luby*, the court addressed the methodology for determining the compensation due for the taking of leasehold. 396 S.W.2d at 198. The court's statement that "in determining such

Nor does any question regarding the compensability of certain property rights preclude certification of a liability-only class. As the Fifth Circuit noted in *In re Deepwater Horizon*, 739 F.3d 790, 815-16 (5th Cir. 2014), this Court has the discretion to use Rule 23(c)(4) to limit class treatment to "particular issues" and reserve other issues for individual determination – a process both sides advocated at the certification hearing. *See* Exhibit A at 46:10-50:20 (counsel for Plaintiffs describing their proposed trial plan of adjudicating liability on a classwide basis while also trying the compensation issues for the Class Representatives as bellwether litigants for those issues); 67:17-18 (counsel for the State agreeing that "it will save time and effort on both parties if we do liability first and then have damages"), 68:9-16 ("[T]he State believes having a liability trial and then, say, a month or two months later only having a damages trial on those individuals that were found liable would save time and effort on all of the parties, would save costs associated with hiring those experts that would be looking at those issues, and would clear the jury or allow the jury to focus in on the specific issues at play during both of those trials."); *see also Deepwater Horizon*, 739 F.3d at 811 (noting the predominance requirements of Rule 23(b)(3) may be satisfied despite the need for individualized damages calculations, especially in cases "in which virtually every issue prior to damages is a common issue") (quoting *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001)).

## B. The Rule 23(b)(2) requirements have been met.

"It is well-established that instead of requiring common issues, Rule 23(b)(2) requires common behavior by the defendant toward the class." *Yates v. Collier*, 868 F.3d 354, 366 (5th

---

value" the loss of personal property did not play a role is not only dictum, but it is also dictum that did <u>not</u> decree personal property always fell outside the scope of constitutional protection.

Cir. 2017) (cleaned up) (quoting *In re Rodriguez*, 695 F.3d 360, 365 (5th Cir. 2012)). "Rule 23(b)(2) does not require common issues, but rather requires common behavior by the defendant towards the class such that class members have been harmed in essentially the same way." *Id.* at 367 (cleaned up, quoting *Rodriguez*, 695 F.3d at 365, and *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 845 (5th Cir. 2012)). Common behavior cannot credibly be denied. As shown above by the testimony of Mr. Jack and the Exhibits presented, the State constructed one Project which impacted each Plaintiff in the same manner.

Likewise, the parties' stipulations confirm that Plaintiffs' declaratory judgment claim is suitable for determination on a class wide basis. *See, e.g.*, ECF 85, Stipulation 13 ("The State's design, construction, operation, and maintenance of Interstate Highway 10 has been conducted through multiple CSJs ("Control-Section-Job" number) and is for a public purpose and/or a public use."); Stipulation 14 ("The proof of liability *vel non* for Counts 1 and 2 of the Amended Master Complaint will not vary with regard to the operative facts regarding the State's actions and the hydrologic and hydraulic factors implicated by the State's construction projects."); Stipulation 24 ("The Project's as-built dimensions and elevation of the roads, highways, cross drainage structures and inline hydraulic structures do not vary based on the location, ownership, or characteristics unique to any specific Plaintiff's property."); Stipulation 28 ("The water levels and rainfall, and an intensity-duration-frequency analysis of the rainfall and water levels for both Tropical Storms Harvey and Imelda, resulting in development of hydrographs for both storms across the affected watersheds will not vary based on the location, ownership, or characteristics unique to any specific Plaintiff's property."); Stipulation 31 ("The substantive issues that will control the outcome at a liability trial concern the State's

design, construction, operations, and maintenance of Interstate Highway 10, and whether the

State's actions caused the flooding of private properties to the north of Interstate Highway 10

owned or leased by the Class and Subclass Members.").

  **C.**  **The Rule 23(b)(3) requirements have been met.**

  In addition to the arguments and evidence presented in their prior briefing, the record

and arguments developed at the hearing support Rule 23(b)(3) certification since common

questions of law and fact necessary to prove the liability of the State for each Plaintiffs' claim

predominate over any questions that are unique to individual claimants, and class treatment is

the superior method of adjudicating the hundreds of identical pending claims.

  **1.**  **Common issues—including the legal standard and factual proof to prove intent for both claims on which Plaintiffs seek certification—predominate over any individual proof needed for their determination.**

  Regardless of whether the Court adopts the State or the Plaintiffs' argument concerning

the requisite intent, resolution of that question <u>itself</u> is a common one whose resolution

predominates over any individualized aspect of <u>either</u> inverse condemnation claim asserted

and thus supports the certification request. *See Prantil v. Arkema, Inc.*, 986 F.3d 570, 577 (5th

Cir. 2021) (directing predominance be determined on a claim-by-claim basis).

  As acknowledged at the hearing, the parties' positions on the "intent to take" question

are diametrically opposed; "It's all or nothing on both sides." Exhibit A at 247:21. Plaintiffs

have acknowledged that they cannot demonstrate the State had the specific intent to take,

damage, or destroy each precise Plaintiff's individual property. As such, if the Court adopts

the State's interpretation of that standard, the State will prevail on Count 1 of the Amended

Master Complaint <u>against the Class *in toto*</u>, thereby rendering certification of the claim proper.

*Cf.* Exhibit A at 247:22-248:3. Conversely, if the Court adopts Plaintiffs' interpretation of the intent required, what the State knew about whether the specific damage alleged (the flooding of upstream property) was substantially certain to result from its conduct, that articulation of a dual inquiry (specific intent as well as foreseeable injury) is "substantially similar" to that under the federal constitution. *See In re Upstream Addicks and Barker (Texas) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 254 (2019) ("A taking occurs either where the government intended to invade the property or where the invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'") (quoting *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003)); *see also City of Austin v. Travis County Landfill Co.*, 73 S.W.3d 234, 238 (Tex. 2002) (noting the substantially similar nature of the state and federal constitutional takings provisions "has led [the Texas Supreme Court] to rely on the United States Supreme Court's interpretation of the federal takings clause in construing our takings provision"). That standard would apply to the entire Class. Either way, the existence of the question supports certification.

And whatever standard the Court adopts, the intent question will be proven *vel non* by a <u>singular</u> universe of evidence focused on the knowledge and understanding of a <u>single</u> actor (the State) chargeable with <u>one</u> compendium of knowledge regarding the risk of recurrent flooding from the State's design, construction, operation, and maintenance of a lone Project. As detailed above, the hearing record shows that TxDOT knew when it designed the plans for this Project that the drainage planned was inadequate and that upstream flooding was substantially likely to occur. And occur it did – not once but twice (so far). Such evidence of recurring flooding from the Project supports a finding of intent and impacts a determination

of the nature of the taking. *See Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 555 (Tex. 2004) (examining the question of recurrence when determining the issue of intent); *see also Brazos River Auth.*, 354 S.W.2d at 108 ("[T]he safer rule to follow is one requiring the plaintiff in actions such as this to establish definitely by evidence above the dignity of conjecture that the damage claimed is the result of a repeated and recurring injury rather than a sporadic one. Until a plaintiff is in [a] position so to establish the repetitious nature of the injury, he should be confined in his demand for damages to those flowing directly from the single injury or flooding."). That the flooding would be caused by the Project was known and understood at the time the State designed and constructed the improvements to IH-10; work carried out <u>even after</u> the upstream properties flooded during Harvey. The State intentionally used the upstream properties as a detention area to store excess stormwater runoff to protect downstream properties from flooding: that is a taking. *See Gragg*, 151 S.W.3d at 554-55 (Tex. 2004) (explaining examination of public-use factor in taking analysis); *Steele*, 603 S.W.2d at 789 (takings provision ensures the government does not force some people alone to bear burdens necessary to provide benefit to the public as a whole).

<u>Both</u> the legal question to be answered <u>and</u> the factual proof to answer it <u>each</u> present a singular analysis and determination for this Court, satisfying predominance:

> Rule 23(b)(3) does <u>not</u> require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions "<u>predominate</u> over any questions affecting only individual [class] members." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) (quoting Fed. R. Civ. P. 23(b)(3)). In the liability phase of this case, common questions predominate. The parties' motions for summary judgment illustrate this predominance, as each party believes they are entitled to summary judgment, which would apply to the entire class. Issues relating to damages and the possible need for individualized findings are not

relevant at this stage of the case where common questions of liability predominate.

*Chen-Oster v. Goldman, Sachs & Co.*, No. 10CIV6950ATRWL, 2022 WL 814074, at *23 (S.D.N.Y. Mar. 17, 2022) (cleaned up) (emphasis in original).[9] The same is true here.

> **2.  Resolution of the State's liability to Plaintiffs as to both their state and federal claims in a single proceeding is a superior procedure to that of holding hundreds of individual trials.**

Whether there has been a taking—the question of liability *vel non*—for an inverse condemnation action under both the Texas and the United States Constitutions is a question of law based on factual underpinnings. *See Bass Enterprises Prod. Co. v. United States*, 133 F.3d 893, 895 (Fed. Cir. 1998) (citing *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 124 (1978)). *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 673 (Tex. 2004) ("While we depend on the district court to resolve disputed facts regarding the extent of the governmental intrusion on the property, the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law.") (quoting *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998)). And whether Plaintiffs are to be compensated for a permanent or a temporary taking is also a question for the Court to decide. *See Bass Enterprises*, 133 F.3d at 895 (citing *Yuba Natural Resources, Inc. v. United States,* 821 F.2d 638, 640 (Fed. Cir. 1987)); *Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Texas), L.P.*, 449 S.W.3d 474, 481 (Tex. 2014). A determination of (a) whether there has been a taking and, if so, (b) whether the taking is to be deemed of a permanent or temporary should be made for all Plaintiffs in a single proceeding.

---

[9] As the Court asked for follow up fresh from the arguments already provided, Plaintiffs simply refer to the common factual and legal matters presenting in their original motion that also support a predominance finding. ECF 69, at 13-21.

As courts have recognized, a taking by flooding "is a specific type of taking." *Howard v. City of Kerrville*, 75 S.W.3d 112, 117 (Tex. App.—San Antonio 2002, pet. denied); *see also Tarrant Reg'l Water Dist. v. Gragg*, 43 S.W.3d 609, 619 (Tex. App.—Waco 2001) ("Taking by flooding is a specific type of inverse condemnation and has been the subject of several decisions."), *aff'd*, 151 S.W.3d 546 (Tex. 2004); *In re Upstream Addicks and Barker (Texas) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 227 (2019) ("This case brings to the court the occasionally recurring question of the extent and the nature of government-induced flooding on private property necessary to rise to the level of a Fifth Amendment taking of a flowage easement.") In such cases, determination of liability is coterminous with the question of causation; the properties taken are those subjected to governmental flooding sufficient to constitute a constitutional taking. *In re Upstream*, 46 Fed. Cl. at 254-55. Thus, a single trial that determines whether the State is liable under either of Plaintiffs' claims would simultaneously determine those Plaintiffs to whom it is liable.[10]

The predominant common issues so pervade this case that classwide resolution of liability is superior to any alternative means of resolving the hundreds of claims at issue.

## CONCLUSION

The Court should grant the motion for class certification.

---

[10] *See, e.g.*, Exhibit A at 105:16-108:15 (Testimony of Professor Slattery explaining methodology and data that he is using to determine whether any specific parcel of property was flooded during Harvey and/or Imelda by the singular pool created during those storms as a result of the State's Project). Indeed, on this point the State has the argument precisely backwards. *E.g.* Exhibit A at 92:12-17. Any differences in causation, i.e., whether "the flood waters that may have harmed class plaintiffs' property actually came not from the State" but from another source (such as riverine flooding) is a question of fact that will be determined on a classwide basis, resolving the issue for each claimant claim in "one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Dated: July 15, 2022

Respectfully submitted,

/s/ Daniel H. Charest

Daniel H. Charest (SBN: 24057803)
E. Lawrence (Larry) Vincent
(SBN: 20585590)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
dcharest@burnscharest.com
lvincent@burnscharest.com

Charles Irvine (SBN: 24055716)
IRVINE & CONNER, PLLC
4709 Austin Street
Houston, Texas 77004
Telephone: (713) 533-1704
Facsimile: (713) 524-5165
charles@irvineconner.com

Lawrence G. Dunbar (SBN: 06209450)
DUNBAR LAW FIRM, PLLC
13121 Louetta Road, #1240
Cypress, Texas 77429
Telephone: (281) 868-7456
Facsimile: (281) 868-7463
ldunbar@dunbarlawtx.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on July 15, 2022, via ECF to all counsel of record, pursuant to the Federal Rules of Civil Procedure.

/s/ Daniel H. Charest

Daniel H. Charest